SHERMAN B., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Office of Children's Services, Appellee.

No. S–14614.

Supreme Court of Alaska.

Dec. 21, 2012.

---

Kristen Stohler, Stohler Law P.C., Palmer, for Appellant.

Michael G. Hotchkin, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Lisa Wilson, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, Guardian Ad Litem.

Before: FABE, Chief Justice, CARPENETI, WINFREE, and STOWERS, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A father challenges the superior court's decision to terminate his parental rights, arguing that the court's conclusions were not supported by clear and convincing evidence, that termination was not in the best interests of the child, and that the court improperly considered certain facts. Because the record supports the superior court's decision to terminate the father's parental rights, and because the superior court properly considered the record as a whole, we affirm.

1. We use pseudonyms for family members to protect their privacy.

2. Georgina was born in September 2007. According to the aunt, she took custody of Georgina

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Darcy's birth

Darcy M. was born cocaine- and marijuana-positive in March 2009, to Amy M.[1] Because of Amy's ongoing substance abuse issues, because she was homeless, and because the father had not been definitively identified, the Office of Children's Services (OCS) took Darcy into emergency custody on March 20, 2009. At a probable cause hearing held shortly after, Amy stipulated that there was probable cause to find Darcy was a child in need of aid. OCS then placed Darcy with Vallerie M., Amy's mother who became a licensed foster parent.

Although OCS stated that the identity of the father was unknown at the time of birth, Sherman B. had learned that Amy was pregnant in the first month of her pregnancy, and testified that as soon as Amy told him she was pregnant he "knew [he] was the dad right then." At the time of the underlying proceedings in this case, Sherman and Amy had two children together: Georgina, who has lived with Sherman's aunt in New York since she was about one year old;[2] and Darcy. Amy has also given birth to a stillborn son by Sherman, and at the time of the termination trial in this case Amy was pregnant with another child by Sherman. Following Darcy's birth, Sherman also fathered a child with another woman, and their child, Khloe J., was born in April 2010. Khloe's mother also suffers from substance abuse issues, and Khloe is similarly in OCS custody.

Sherman had minimal contact with Amy while she was pregnant with Darcy. For some of Amy's pregnancy with Darcy and at the time of Darcy's birth, Sherman was in Whittier working for a seafood processor. In March 2009, a paternity test was facilitated by OCS; results confirmed that Sherman was the father. Sherman learned of the test results on June 3, 2009. Before being asked to complete a paternity test and during the

after Sherman left Georgina at the home of another family member in Georgia and returned to Alaska.

pendency of the paternity test, Sherman made no attempt to contact Amy or Vallerie regarding Darcy's birth or to otherwise see Darcy.

### 2. March 2009 through mid-2010

After Sherman's paternity was established in June, OCS filed an Amended Emergency Petition for Adjudication of Child in Need of Aid for Temporary Custody. This petition noted that OCS scheduled both an advisement hearing for June 4, 2009, and an appointment for June 8, 2009, to discuss Sherman's contact with Darcy, gather a social history, and develop a case plan. Sherman failed to show up on both dates. He did show up at OCS on June 9, and agreed to come back the next day. On June 10, OCS completed a social history but notes about the meeting explain that Sherman "refused to [work] a case plan until his lawyer is present." The emergency petition also noted Sherman's extensive history of trouble with the law. This included two previous protective services reports concerning other children, one substantiated and the other unsubstantiated, alleging that Sherman "was selling crack and had shot a gun in a drug deal altercation." OCS found 45 court case filings involving Sherman, including "convictions for assault 4, several assault 1st, several misconduct-controlled substance, felonies, misdemeanors, domestic violence petitions, and driving without a valid license." Based on the above information, OCS concluded that placement with OCS would promote Darcy's best interests.

In the months following OCS's initial involvement in the case, Sherman requested custody of Darcy—but his plan was to transfer Darcy to his aunt's home in New York, rather than to have Darcy live with him. On February 11, 2010, Sherman filed a Motion to Change Placement, seeking to change Darcy's custody from Vallerie to Sherman's aunt.

During a placement review hearing on May 5, 2010, the superior court noted Sherman's position was "very clear and consistent"—he sought placement with his aunt in New York. The superior court denied Sherman's motion, but instructed Sherman to notify the court within two weeks if he wanted to seek placement with himself. After the superior court's denial, OCS continued to pursue the option of sending Darcy to live with Sherman's aunt but eventually denied the request after receiving a report from the New York Department of Social Services explaining that the aunt lacked the resources to care for additional children. In May 2010, about 14 months after Darcy's birth, Sherman made his first formal request for Darcy's placement in his home. However, the court questioned whether Sherman's plan to have Darcy live with him was sincere.

Sherman's 2009 case plan required him to: (1) complete a psychological assessment and follow the recommendations;[3] (2) commit no further crimes; (3) complete a parenting class appropriate for infants and follow the recommendations; (4) maintain at least weekly contact with Darcy (more if possible); (5) make an appointment for the social worker to make a home visit; (6) provide telephone numbers and addresses of relative placements; and (7) provide urinalyses upon request.

Despite his case plan's requirement that he maintain weekly contact with Darcy, Sherman visited Darcy only intermittently from June 2009 through February 2010. After his first visit at OCS, in June 2009, he reported that he would be out of town for two or three months. His visitation was sporadic; he often missed appointments or appeared late. His visits were transferred from OCS to a youth treatment center, but they were eventually returned to OCS because of Sherman's behavior—he had been making video record-

---

**3.** Early on in this case, OCS moved for a psychological evaluation of Sherman. In February 2010, noting that Sherman had not requested that Darcy be placed with him, the superior court found that Sherman's psychological health was not in controversy and therefore denied the motion. After Sherman requested placement of Darcy with him, OCS renewed its request for psychological evaluation. Sherman refused. Although the superior court agreed that Sherman's request for placement put his mental health in controversy, the court concluded that there was not good cause to order an exam. OCS later added a parenting assessment to Sherman's case plan, but there were complications in completing a parenting assessment because such assessments generally include a mental health component.

ings of his visits and when asked to stop he became verbally aggressive. Once visits returned to OCS, visits became more regular, Sherman consistently showed up, and interactions with Darcy improved.

In early 2010, Sherman was arrested along with Khloe's mother at an Anchorage hotel for possession of cocaine. Cocaine was found in his room, and a large amount of cocaine was found just outside of his room in the snow. These charges later were dropped.

In June 2010, OCS petitioned to terminate Sherman's and Amy's parental rights to Darcy. A termination trial was originally scheduled for December 2010, but was later postponed to March 2011.

By July 2010 Sherman had "somewhat complied" with the requirement that he attend parenting classes, having attended most of his scheduled parenting classes with Fathers Insync over a two-month period. But with only four classes left to complete, the social worker was notified that the class was going to terminate Sherman for non-attendance. Although the social worker intervened, Sherman missed further classes and was told that he would have to start over. Ultimately, a compromise was struck that allowed him to complete the course work with Fathers Insync.

OCS had difficulty obtaining information regarding Sherman's employment and living arrangements. An OCS social worker testified that, during this early part of the case, Sherman "moved around quite a bit and it was difficult for the department to ... establish or know where he was living. He was changing ... places where he was staying quite a bit." A July 2010 report filed by Darcy's guardian ad litem explained that Sherman had not informed OCS where he lived until May 2010 and at that time his employment had yet to be confirmed. OCS also had concerns about "how he was obtaining his income," specifically whether he was obtaining money through illegal means. Sherman's total documented income for 2009 was $5,800. At the termination trial, Sherman testified that in fall 2009 he worked for NANA Regional Corporation, Inc. as a van and courtesy driver and was living in a condo. The checks that he submitted, however,

only showed that he worked at NANA for seven weeks. Further, Sherman could not provide proof of income for 2010. When asked about this at the trial, Sherman testified that he did not have a steady job in 2010—specifically, he testified that his total work for the year consisted of cutting grass on three or four occasions (resulting in about $150), selling some seafood (resulting in about $400), and working for Wonder Bread for a month or two. Sherman also claimed to have worked on a movie set for about one month. Additionally, in August 2010 Sherman filed a financial statement with the court claiming zero income during the prior 12 months. The only documentation of income for 2011 showed that Sherman worked at a Pizza Hut restaurant for two months, for which he was paid $400. At an October 2010 hearing, Sherman testified that he has not filed a tax return in at least 15 years.

### 3. Mid–2010 through March 2011

By June 2010 Sherman had moved into an apartment and taken steps to child-proof the home. OCS visited the apartment on at least two occasions and found the apartment safe for a child.

During this time, Sherman continued to engage in supervised weekly visits with Darcy. In November 2010, visits were switched to Sherman's apartment, and for a time Sherman had about two visits per week with Darcy. By the end of December, visits were no longer supervised. A social service associate testified that visits became more productive after they moved from OCS to Sherman's apartment. In light of this improvement, OCS withdrew its petition to terminate parental rights and scheduled a Team Decision Meeting for March 2011 to discuss the possibility of beginning overnight visits.

### 4. Sherman leaves for New York

On March 14, 2011, the day before the scheduled Team Decision Meeting, Sherman left a voice mail for an OCS social worker stating that he was "leaving state for a month or so to deal with some family issues." Sherman's purpose in traveling to New York

was to bring Georgina back to Alaska. Sherman did not tell Darcy that he was leaving for New York. In total, he was out of Alaska for about six weeks.

According to an August 2011 Decision and Order of a New York family court, on March 16 Sherman arrived unannounced at his aunt's home, picked up Georgina, and walked out the door. Georgina was "upset and crying because she didn't know who [Sherman] was." The aunt called the police and the court ordered Sherman to return Georgina. The New York court further found that between December 20, 2008, when Georgina arrived in New York, and March 16, 2011, Sherman had no contact whatsoever with Georgina. He did not visit, write, or provide any means of support for Georgina; although he did speak with his aunt once or twice a month. In its order, granting sole physical and legal custody to the aunt, the New York court commented on Sherman as follows:

> The respondent demonstrated incredibly bad judgment on March 16, 2011 when, after an absence of approximately 2 1/2 years from this child's life, he appeared at [the aunt's] door and forcibly took the child into his care. He demonstrated a complete insensitivity to the needs of the child by engaging in this behavior. It is almost incomprehensible to the court to understand how a parent who has not seen a very young child for the last two-thirds of her life could precipitously and forcibly remove the child from the one person who has been the ongoing caretaker of that child. The court can only imagine the discomfort the child experienced when removed from the petitioner's home and taken by an individual who was essentially a stranger to this child. This behavior by the respondent demonstrated such incredibly poor parental judgment as to have the court question his fitness to be responsible for any child.

### 5. Sherman's return to Alaska

Sometime in March 2011 Sherman was evicted from his apartment. During Sherman's absence, OCS learned that Sherman had been allowing Khloe's mother, a woman with significant and untreated substance abuse issues, to be present during unsupervised visits with Darcy and Khloe in Sherman's apartment, in violation of OCS directives. Because of this concern OCS required that visits be supervised and transferred visits back to OCS. These supervised visits began in mid-May, a month after Sherman had returned from New York.

An OCS social worker testified that these supervised visits at OCS during summer of 2011 were "very, very difficult." The social worker stated that Sherman did not allow OCS to provide assistance during visits and did not have the requisite tools to appropriately parent his children. In mid-June, following an incident during a joint visit with both Darcy and Khloe, where Khloe was inconsolable, Sherman's visits were canceled because OCS was concerned "that he wasn't taking direction from anybody" and because the supervisor had concerns regarding OCS workers' safety around Sherman. After this incident, no further visits were held until September 2011 and Sherman had no contact with Darcy for over two months.

In early July, Sherman left Anchorage to go to Kenai for work, noting that he did not know when he would be back. OCS informed him that it would be difficult to set up visits while he was out of town. In early September, OCS received a letter from Sherman informing them that he was back in town.

During this period, OCS was not sure where Sherman was living after he was evicted from his apartment. Further, a social worker testified that, after April 2011, telephone communication with Sherman was "extremely difficult," with Sherman having provided multiple phone numbers, some of which were disconnected or wrong numbers.

### 6. Visits at the Cook Inlet Tribal Council

At some point during summer 2011, Sherman commented that he did not want OCS's assistance and instead wanted "a professional" to assist him. OCS contacted a one-on-one parent coach who was willing to work with Sherman, but only after he completed "an intensive parenting class." Sherman re-

fused, stating that he had already completed parenting classes and would not engage in any further classes.

In late September, joint visits with Darcy and Khloe resumed. Because of the difficult visits during the summer and because Sherman asked for professional assistance, the visits were held at Cook Inlet Tribal Council (Cook Inlet)—a family contact site generally used for those needing a higher level of supervision. Esther England, a trained parent coach at Cook Inlet, supervised Sherman's visits. England testified that Sherman would attempt to videotape the visits in order "to build his case." Sherman continued to resist parent coaching, telling England that he had completed parenting classes and did not need any assistance. England testified that she had a number of concerns regarding Sherman's understanding of child development. For example, England testified that Sherman had decided to enroll Darcy in piano lessons that were an hour long. England told Sherman that hour-long piano lessons might be too long for a two-year-old, and Sherman responded that he had a right see Darcy and that he would be bringing England before the court.

During a visit in October 2011, Khloe had to be removed by Cook Inlet staff because she would not stop screaming and crying. A case manager for a parenting class called Fathers' Journey came in to offer Sherman support and to tell him about the class's meeting times. Sherman responded that he had already completed parenting classes, that "he could not be compelled even by law to come to a fathers' group," and that "he already knows everything he needs to know about caring for his children."[4] After this visit, Sherman had visits alone with Darcy, because OCS determined that the visits were too traumatizing for Khloe.

While the next visit, in mid-October, was "by far the best visit for Darcy," England testified that Sherman missed three of the next four visits without notifying Cook Inlet. Sherman showed up for the following visit, on December 2, but, because he had not called to confirm that he would be coming, Darcy was not available. Sherman then had what England describes as four "appropriate" visits with Darcy during December, including a holiday family gathering at Cook Inlet at which Sherman did a "pretty good job." However, England testified that she still had concerns about his interactions and would not recommend unsupervised visits. Sylvia Berg, England's supervisor at Cook Inlet, agreed that the visits had improved over time, but noted that Sherman was not yet ready for unsupervised visits.

## B. Proceedings

On October 3, 2011, OCS filed a second Petition for Termination of Parental Rights and Responsibilities for Sherman and Amy. In its petition, OCS alleged that as a result of Sherman's actions Darcy was a child in need of aid pursuant to AS 47.10.011(1) (abandonment) and (9) (neglect). The superior court held a termination hearing in January 2012. Amy presented a signed relinquishment of parental rights on the first day of the termination trial.[5] After a three-day trial, the court concluded that the State had shown by clear and convincing evidence that Sherman had abandoned Darcy and had failed to remedy such abandonment in a reasonable time, and that OCS made reasonable efforts to provide family support services. Finally, the court held that termination of Sherman's parental rights was in the Darcy's best interests. Sherman appeals.

## III. STANDARD OF REVIEW

 In child in need of aid cases a superior court's factual findings are reviewed for clear error.[6] Findings are clearly erroneous if review of the entire record leaves us with "a definite and firm conviction that a

---

4. Sherman did testify, however, that he later did an intake with Fathers' Journeys in December. He testified at the termination trial that he had also signed up for a class with Fathers' Journeys.

5. The termination of Amy's parental rights is not at issue in the present appeal.

6. *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103 (Alaska 2011) (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008)).

mistake has been made."[7] "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[8] Whether a child is in need of aid and whether the parent failed to remedy the "conduct or the conditions that placed the child at substantial risk" of harm are factual findings reviewed for clear error.[9] Best interest determinations are also factual findings subject to clear error review.[10] Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact.[11] We review questions of law de novo.[12] "We bear in mind at all times that terminating parental rights is a drastic measure."[13]

## IV. DISCUSSION

To terminate parental rights under AS 47.10.088, a superior court must make three findings by clear and convincing evidence. First, the court must find that the child has been subjected to conduct or conditions that have caused the child to be in need of aid.[14] Second, there must be a finding that the parent has failed, within a reasonable time, to remedy the conduct or conditions that placed the child at substantial risk of harm.[15]

Third, the court must find that OCS made reasonable efforts to promote reunification.[16] The court must also find by a preponderance of the evidence that termination is in the child's best interests.[17]

### A. The Superior Court Did Not Err In Finding That Darcy Was A Child In Need Of Aid.

Alaska Statute 47.10.011(1) provides that a child may be found to be a child in need of aid if "a parent or guardian has abandoned the child as described in AS 47.10.013, and the other parent is absent or has committed conduct or created conditions that cause the child to be in need of aid under this chapter."[18] Alaska Statute 47.10.013(a) defines abandonment as "a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the child's age and need for care by an adult."[19] In considering whether a parent consciously disregarded parental obligations, a court applies "an objective test to see if actions demonstrate a willful disregard of parental responsibility."[20]

---

7. *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010) (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

8. *Maisy W.*, 175 P.3d at 1267 (footnote omitted) (quoting *Brynna B.*, 88 P.3d at 529; *DM v. State, Div. of Family & Youth Servs.*, 995 P.2d 205, 214 (Alaska 2000)) (internal quotation marks omitted).

9. *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011) (citing *T.B. v. State*, 922 P.2d 271, 273 (Alaska 1996); *Barbara P.*, 234 P.3d at 1253).

10. *Christina J.*, 254 P.3d at 1104 (citing *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 721 (Alaska 2003)).

11. *Cf. id.* (citing *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)) ("[W]hether OCS has made active efforts as required by ICWA is a mixed question of law and fact; our court reviews the questions of law de novo.").

12. *Id.*

13. *Id.* (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

14. AS 47.10.088(a)(1); AS 47.10.011.

15. AS 47.10.088(a)(2)(A)-(B).

16. AS 47.10.088(a)(3), AS 47.10.086 (describing department's duty to make reasonable efforts).

17. CINA Rule 18(c)(3) (comporting with AS 47.10.088(c)).

18. AS 47.10.011(1).

19. AS 47.10.013(a).

20. *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 775 (Alaska 2012) (quoting *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335-36 (Alaska 2011)) (internal quotation marks omitted).

The superior court found that Sherman abandoned Darcy. To support this finding of abandonment, the superior court did not rely primarily on one period of no contact, but considered Sherman's actions over the entire course of Darcy's life. The superior court found that Sherman had not maintained regular contact with Darcy, had not provided reasonable support, either financial or emotional, for Darcy, and had not created a parent-child relationship with Darcy.

Sherman argues that he has been active throughout this case, that he has maintained visits with Darcy, and that the superior court's consideration of whether he can provide reasonable economic support penalized him for being poor in contravention of AS 47.10.019.[21] He further challenges the superior court's reliance on his actions during Amy's pregnancy and his plan to send Darcy to New York to live with his aunt. The State contends that the superior court's finding that Sherman abandoned Darcy is adequately supported by the record. We agree.

Alaska Statute 47.10.013 specifically requires a court to consider "the child's age and need for care by an adult." Darcy is a very young child—at the time of the termination trial she was not yet three years old—and therefore requires constant, 24–hour supervision and stability. In this context, Sherman's minimal and inconsistent contact with Darcy, failure to provide emotional or financial support, and failure to cooperate with OCS or comply with his case plan all support the superior court's finding that Sherman consciously disregarded his parental responsibilities.

Sherman's assertion that he worked diligently to develop his relationship with Darcy is not supported by the record. The superior court correctly noted that reasonable contact is evaluated in light of OCS's limitations on visitation and found that Sherman did not maintain reasonable contact. Sherman's 2009 case plan directed him to maintain weekly contact with Darcy. Although there was a period of Darcy's life when Sherman kept a regular visitation schedule, for much of 2009 and 2011 he had little contact with Darcy. Most recently, from April 2011 to December 2011, he spent a total of 16 hours with Darcy. On three separate occasions Sherman left Anchorage for weeks at a time without notifying Darcy or OCS in advance.[22] Even when present, Sherman missed a number of visits without notice. The superior court characterized Sherman's contact with Darcy as minimal and analogized his relationship with her to that of a "distant uncle," visiting when it was convenient for him. This evidence satisfies the objective standard for "willful disregard of parental responsibility."

■ We have previously stated that in order to refute evidence of a willful disregard of parental responsibility, a parent must show a "continuing interest in the child and [. . . make] a *genuine effort* to maintain communication and association."[23] Here, in addition to Sherman's minimal contact with Darcy, the superior court considered Sherman's minimal efforts at compliance with other aspects of his case plan, including the requirements to provide urinalyses, provide basic contact information, and complete a parenting assessment. He also had difficulty completing parenting classes and without OCS intervention he would have been terminated for non-attendance. Sherman argues that he did not agree with certain components of his case plan, and therefore "pushed back." Even if he did not agree with or trust OCS, the reality is that communication with OCS and compliance with the case plan's reasonable requirements were necessary to build a relationship with his daughter under the circumstances. Further, the record shows that Sherman is unable to provide

---

**21.** AS 47.10.019 provides, in relevant part, that a court "may not find a minor to be a child in need of aid ... solely on the basis that the child's family is poor...."

**22.** In March 2011, Sherman left for New York for six weeks, without prior notice to OCS, to deal with a custody hearing regarding Georgina. OCS resumed visits upon his return in May, but a month later the visits were cancelled because they were very difficult for Darcy and Khloe. Sherman then left for work in Kenai and for travel back to New York, and visits did not resume until late September.

**23.** *Sean B.,* 251 P.3d at 336 (alteration in original) (emphasis added) (quoting *Jeff A.C., Jr. v. State,* 117 P.3d 697, 704 (Alaska 2005)).

sufficient care for a child of Darcy's age, and has continually refused assistance from OCS on how to comfort or relate to Darcy (and Khloe). Objectively, Sherman's actions do not demonstrate a genuine effort to build a parent-child relationship. While there is no doubt that Sherman cares for Darcy, a "parent's subjective intent or ... token efforts to communicate with the child"[24] are not enough to establish a parent-child relationship.

Sherman argues that he has been diligent in seeking stable employment and consistent housing, and the superior court's consideration of his financial situation violates AS 47.10.019.[25] However, the superior court's concern regarding Sherman's finances was his lack of transparency—he was secretive about his income and housing, making it difficult for OCS to make decisions concerning Darcy's placement.[26] Sherman's refusal to provide even basic information and communicate with OCS is evidence of his conscious disregard of his parental responsibilities. Further, the superior court found that Sherman was also not able to provide reasonable emotional support for Darcy. Sherman's financial situation was not the basis for the superior court's finding that Darcy was a child in need of aid, and therefore the superior court did not violate AS 47.10.019.

The superior court did not err when it considered Sherman's initial plan to send Darcy to New York. Sherman did not affirmatively request that Darcy be placed with him until she was almost 14 months old; instead, he originally wanted to send Darcy to live with his aunt.[27] While Sherman is correct that his intent to send Darcy to live with a relative does not automatically result in a finding of abandonment; the superior court's finding that Sherman abandoned Darcy was not limited to consideration of this issue. Further, the superior court considered Sherman's plan in context—Sherman's daughter Georgina had been sent to New York to live with his aunt, and Sherman did not have contact with her for over two years, until he attempted to forcibly remove Georgina from his aunt's care.[28] Admittedly, Sherman's conduct with his other children is not determinative of his conduct with Darcy. But a court is not required to ignore this history; Sherman's similar plan to send Darcy to live with his aunt provides some insight into his willingness to assume parental responsibility.

Although the facts before us do not present the typical case of abandonment, where a parent is absent for a long period of time, the facts as a whole support a finding that Sherman has consciously disregarded his parental responsibilities by failing to maintain regular

24. *Id.* (alteration omitted) (internal quotation marks omitted).

25. *See supra* note 21.

26. The superior court stated:

> [S]ecrecy about such a significant set of events, housing and employment, when OCS is trying to figure out should we give the child back to the father, suggests that his priorities were certainly not to have the child returned to him. The reasonable thing to do would be to set up a house, be transparent about your jobs—even if there's a lack of employment, just be transparent about that so OCS can say, is this somebody that is a prospective parent and a responsible parent, and who has parenthood as a priority? And the answer has to be no.

27. Sherman argues that his intent was always to parent Darcy himself, and he had asked his aunt to care for Darcy on a temporary basis and therefore challenges the superior court's reliance on his plan to send Darcy to New York. He

points to a "Home Study Narrative" completed by the New York Department of Social Services, which indicates that Sherman asked his aunt to care for Darcy on a temporary basis. But before May 2010 he repeatedly stated that he wanted to send her to New York, with no indication that this was a temporary placement. In a May 2010 order, the superior court denied Sherman's motion for placement with his aunt, and stated that Sherman "shall have until [May 19, 2010] to indicate whether he wants [Darcy] to be placed in his home." Further, even after Sherman requested Darcy be placed with him, the superior court expressed doubt as to his true intentions. The superior court's determination that Sherman did not request placement until May 2010 was supported by the record, and we will not reweigh this evidence

28. A New York court later terminated Sherman's parental rights to Georgina commenting that his behavior "demonstrated such incredibly poor parental judgment as to have the court question his fitness to be responsible for any child." *See supra* at 426.

contact, failing to provide reasonable support, and failing to provide normal supervision. Thus, the superior court did not err in finding that Sherman abandoned his daughter under AS 47.10.013(a). Because we affirm the superior court's finding of abandonment, we do not reach the State's alternative argument for termination based on neglect.[29]

**B. The Superior Court Did Not Err In Concluding That Sherman Failed To Remedy The Conditions That Placed Darcy In Need Of Aid.**

Sherman argues that there is insufficient evidence to support the superior court's conclusion that he failed to remedy the conduct or conditions that placed Darcy in need of aid. Before terminating parental rights under AS 47.10.088, the court must find by clear and convincing evidence that the parent has not remedied the conduct that placed the child at substantial risk of harm.[30] When a court makes this determination, AS 47.10.088(b) requires it to consider "any fact" relating to the best interests of the child, including "the parent's efforts; the history of harmful conduct or conditions created by the parent; the likelihood that harmful conduct will continue; and the likelihood of returning the child to the parent within a reasonable time, considering the child's age and needs." [31]

Sherman contends that "[s]ince [Darcy] was taken into the state's custody, [he] has worked stridently to form a bond with his daughter." He argues that he has taken parenting classes, requested additional parenting help as needed, completed urinalysis testing, secured housing, and sought out assistance from other sources as needed. The State responds that, as of the date of the termination trial, Sherman's abandonment of Darcy was ongoing and therefore he had not remedied the conduct or conditions that endangered her. Taken together, the facts suggest that Sherman's efforts to remedy his conduct were minimal; that his pattern of missing visits, refusing to comply with his case plan, and refusing assistance from OCS was likely to continue because he lacks a fundamental understanding of how his behavior affects Darcy; and that it was therefore unlikely that Darcy would be placed with Sherman in a reasonable time.

The history of Sherman's visitation with Darcy demonstrates that his contact was minimal and inconsistent over the course of her life. This history supports a finding that Sherman has not remedied his abandonment of Darcy. In June 2010, a year after OCS's initial involvement with Sherman, OCS first petitioned to terminate parental rights. A guardian ad litem report at that time noted that Sherman was "non-compliant with important parts of his case plan and [was] still having only weekly supervised visits with his daughter after all this time. He has not demonstrated that he is focused on raising and parenting this small child." The termination hearing was scheduled for March 2011. As the superior court acknowledged, there was a period in late 2010 when Sherman was having regular visits and OCS was increasing his contact with Darcy. OCS withdrew its petition for termination. However in March 2011, Sherman left Alaska without advance notice and traveled to New York for six weeks. When visitation resumed in May the visits regressed, and OCS cancelled the visits in June because they were going very badly, Sherman would not accept help from the caseworkers, and the caseworkers feared for their safety. Sherman then left for Kenai to find work. When he returned in September, OCS resumed visits, but, as he had done before, Sherman missed several visits. In October 2011, OCS again petitioned for termination. Although there were some positive visits in December, a few isolated visits do not remedy Sherman's history of disregarding his parental responsibilities.

Over almost three years, Sherman has also failed to provide reasonable support or develop a parent-child relationship. The superior court explained that the income he identified

---

**29.** *See Rick P. v. State, Office of Children's Servs.,* 109 P.3d 950, 956 (Alaska 2005) (noting that it is unnecessary to consider other finding where one ground for finding child to be in need of aid is supported by record).

**30.** AS 47.10.088(a)(2).

**31.** *Sean B. v. State, Dep't of Health & Soc. Servs.,* 251 P.3d 330, 337 (Alaska 2011).

since Darcy's birth "now totals about $6,000, which is not enough to provide for a child.... [Yet, Sherman] was not interested in working with public assistance to obtain income...." Further, as the superior court noted, Sherman lacks a fundamental understanding of child development and several OCS workers expressed concern about Sherman's ability to perceive the needs of his young children or understand the ways his behavior impacts Darcy. He continually refused to accept assistance from parent coaches supervising visits to aid in building a parent-child relationship; he even refused to comply with the prerequisites for one-on-one coaching that was offered at his request.

It is telling that after three years, two Cook Inlet staff members testified that they would not recommend unsupervised visits. The superior court found that it would be at least a year before placement with Sherman would be considered. Therefore, even if Sherman's performance showed consistent improvement, Darcy would not be placed with him in a reasonable time, given Darcy's age and need for permanency.[32]

Darcy had been a child in need of aid for almost three years at the time of trial. Although there were periods of time when Sherman's contacts with Darcy improved, these periods do not overcome the evidence in the record that Sherman was unable to maintain regular contact, provide reasonable support (financial or emotional), or provide normal supervision for Darcy, including at the time of termination. The superior court did not err in finding that Sherman failed to remedy the conditions that placed Darcy in need of aid.

## C. The Superior Court Did Not Err In Concluding That OCS Made Reasonable Efforts To Reunify Sherman With Darcy As Required By AS 47.10.086(a).

▆▆▆ Sherman next contends that the record does not support the superior court's

conclusion that OCS made reasonable efforts to provide family support services. Before terminating parental rights under AS 47.10.088, the court must find by clear and convincing evidence that the State made timely and reasonable efforts to provide services to the family for the purpose of reunification. Alaska Statute 47.10.086(a) elaborates on this requirement. It requires the State to

(1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;

(2) actively offer the parent or guardian, and refer the parent or guardian to, the services ... whenever community-based services are available and desired by the parent or guardian; and

(3) document the department's actions....

We have acknowledged that the State has some discretion both in determining what efforts to pursue and when to pursue them.[33] "A parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide."[34] "The efforts that OCS makes must be reasonable but need not be perfect."[35]

Sherman asserts that because of personality conflicts with OCS staff members he did not receive proper assistance from OCS. These assertions are unsupported by the record. Sherman points to the fact that he chose to file grievances against two OCS case workers. His discontent with the case workers is not determinative of the reasonableness of their decision making.

The record shows that despite the difficulty in working with Sherman—including his refusal to provide financial and contact infor-

---

**32.** Whether Darcy could be placed with Sherman within a reasonable time, given her age and need for permanency is discussed in further detail *infra* in section IV.D.

**33.** *Sean B.*, 251 P.3d at 338 (citing *Jeff A.C., Jr. v. State*, 117 P.3d 697, 706 (Alaska 2005)).

**34.** *Id.*

**35.** *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008) (citing *Jeff A.C., Jr.*, 117 P.3d at 706).

mation, failure to attend visits without notifying OCS, and failure to accept OCS assistance during visits—OCS provided a number of services in an attempt to reunify Sherman with Darcy. OCS first provided Sherman with the test that established his paternity. It began a referral under the Interstate Compact for the Placement of Children to Sherman's aunt in New York to evaluate the possibility of placing Darcy there; and the superior court found that, had the home been approved, OCS would have placed Darcy there. OCS arranged and paid for parenting classes at Fathers Insync. When Fathers Insync wanted to terminate Sherman for lack of attendance, OCS intervened on his behalf, allowing him to complete the course. OCS facilitated ongoing visits with Darcy and, at Sherman's request, located outside parenting coaches to work with him on parenting skills. From late 2010 until March 2011, OCS increased Sherman's visits appropriately. When on the verge of a scheduled overnight visit, Sherman chose to leave the state without advance notice. OCS offered other services, including a parenting assessment, assistance obtaining housing or income through public assistance, and additional parent coaching, but Sherman refused these offers. As the superior court noted, while many of OCS's efforts were directed toward evaluation of Sherman, this was a reasonable choice given Sherman's resistance to working with OCS, its suspicion that he was involved in illicit activities, Sherman's conduct with his other children, and his plan to send Darcy to New York.

Sherman further asserts that OCS is unfairly punishing him for going to New York to attend to another custody hearing for his daughter Georgina. He contends that after his return, OCS's efforts were patently unreasonable under the circumstances as it delayed visits for an additional month and failed to make arrangements for continued contact with Darcy while he was traveling. It was Sherman's decision to leave Alaska with no advance notice to OCS and no esti-

mated date when he would return. There is no evidence that Sherman attempted to contact Darcy during his absence. Over a month after Sherman left, OCS contacted him to find out if he had returned. Further, while Sherman was in New York, OCS learned that he had allowed Khloe's mother, a woman with significant substance abuse problems, to attend unsupervised visits at his apartment. Under these circumstances, OCS's decision to return visits to OCS was warranted and a 30–day delay in restarting visits does not render OCS's efforts unreasonable. Moreover, even after OCS restarted visits, Sherman's visits were soon cancelled due to Sherman's behavior, leading to further disruptions in contact with Darcy. He then left for Kenai, and OCS warned Sherman that it would be difficult to schedule visits while he was out of town. OCS worked to set up visits upon his return.

OCS caseworkers made reasonable efforts to maintain contact with Sherman, connect him with services, and facilitate the establishment of a relationship between him and Darcy. The superior court did not err in finding that OCS made reasonable efforts to reunify Sherman with Darcy.

### D. The Superior Court Did Not Err In Concluding That Termination Of Sherman's Parental Rights Was In Darcy's Best Interests.

■ Sherman challenges the superior court's conclusion that termination of parental rights was in Darcy's best interests. Under AS 47.10.088(c) and CINA Rule 18(c)(3), the trial court must determine, by a preponderance of the evidence, whether termination of parental rights is in the best interests of the child. We have stated that "in a termination trial, the best interests of the child, not those of the parents, are paramount." [36]

The Alaska Legislature has found that "children under six years of age suffer tremendously when their bonding processes are interrupted." [37] We have often noted that

**36.** *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 601 (Alaska 2010) (quoting *A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 954 (Alaska 2000)).

**37.** *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 56 (Alaska 2003) (citing AS 47.05.065(5)); *see also Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 958 (Alaska 2005).

"young children require permanency and stability or risk long-term harm."[38] We have also stated that "the fact that a child has bonded with her foster parent can be a factor in considering whether it is in the child's best interests to terminate a parent's rights."[39] At the time of the termination trial, Darcy was almost three years old. Darcy was placed in Vallerie's care almost immediately after her birth, and has lived with her ever since. Vallerie is fully able to support and care for Darcy. Evidence at trial demonstrated that Vallerie and Darcy have a close bond and the superior court found that there would be great harm to Darcy if this bond were broken.

The superior court acknowledged that in some cases it might be in the best interests of the child to break a bond with a foster parent in order to place the child with a biological parent, but explained that this is not such a case. We agree.

Sherman's assertions that he is committed to having Darcy live with him and that he has made adequate arrangements for her care lack support in the record. Sherman has been unable to consistently demonstrate appropriate parenting skills and has resisted OCS's efforts to assist him with Darcy. Sherman has been unable to demonstrate any financial stability. Further, as discussed by OCS and Cook Inlet staff, Sherman's conduct—failing to visit Darcy regularly, leaving the state without notice, allowing a known substance abuser to be present during unsupervised visits—indicates that he does not always have Darcy's best interests in mind, and lacks an understanding of how his actions impact Darcy.

On these facts, the superior court found that it would be at least a year before temporary placement with Sherman could even be considered. While the child's positive current placement with her grandmother is not determinative of whether termination is in the child's best interests, in this case it is relevant because of Darcy's age and the strength of the bond with Vallerie. Given the potential harm from severing the bond with the only caretaker she has ever known, there is adequate support in the record that it is in Darcy's best interests to remain in Vallerie's care permanently. Therefore, the superior court did not err in concluding that termination was in the best interests of the child.

## V. CONCLUSION

We AFFIRM the superior court's termination of Sherman's parental rights.

MAASSEN, Justice, not participating.

---

38. *Debbie G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 132 P.3d 1168, 1171 n. 5 (Alaska 2006) (quoting *Stanley B. v. State, Div. of Family & Youth Servs.*, 93 P.3d 403, 408 (Alaska 2004)) (internal quotation marks omitted).

39. *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 185 (Alaska 2008) (citations omitted).