NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KEIRA H., | ) | |
| | ) | Supreme Court No. S-16608 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 4FA-13-00089/ |
| v. | ) | 14-00121 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1660 – December 13, 2017 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: Carolyn Perkins, Law Office of Carolyn Perkins, Salt Lake City, Utah, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Carney, Justice, not participating.]

---

\*        Entered under Alaska Appellate Rule 214.

# I.    INTRODUCTION

Keira H. appeals the superior court's order terminating her parental rights to her two children, Emmy and Jeremy.[1]  Keira challenges the superior court's findings that (1) she failed to remedy the conduct or conditions that placed her children in need of aid and (2) the Office of Children's Services (OCS) made reasonable efforts to reunify the family.[2]  Finding no error, we affirm the superior court's order.

# II.   FACTS AND PROCEEDINGS

## A.    OCS's Involvement

Keira has a history of drug and alcohol abuse and has been diagnosed with alcohol dependency.  She began using marijuana when she was 14 years old.  Keira met Brayden,[3] her long-term boyfriend, in 2008.  Their first child, Emmy, was born in August 2012.

In August 2013 OCS received reports that Keira and Brayden were using controlled substances, acting erratically, and engaging in domestic violence.  Keira testified at the termination trial that she and Brayden were occasionally using methamphetamine and marijuana around this time.  OCS workers went to the family's home to investigate in September.  When they arrived they saw that both parents were "under the influence."  One of the OCS workers would later testify that Keira, in particular, was "in a heightened emotional state": "[s]he would be happy, mad, sad within . . . 30 seconds."  She "wasn't able to carry on a coherent conversation" and "was

---

[1]     We use pseudonyms to protect the family's privacy.

[2]     AS 47.10.088(a)(2)-(3).

[3]     Brayden's parental rights were terminated in the same order as Keira's were, but he does not appeal this order. We discuss him only to the extent necessary to understand Keira's progress.

unable to walk." In addition, the inside of the home was "very unsanitary" and contained hazards for children such as loose wires, missing flooring, and drug paraphernalia. A portion of the trailer was fire damaged. Outside the home there was "[l]ots of clutter, lots of trash."

The OCS workers were concerned that the "unhealthy and hazardous living environment" and the apparent intoxication of "both caregivers" created a "present danger" for Emmy. Consequently, OCS took Emmy into emergency custody, and the superior court later granted OCS's petition for temporary custody.[4] Emmy was placed in the foster care of the McKnights — Brayden's sister and her husband. At the time of her removal from Keira and Brayden's custody, Emmy tested positive for marijuana and methamphetamine.

While Emmy was in OCS custody, Keira became pregnant with the couple's second child, Jeremy. Keira smoked marijuana throughout the pregnancy. An OCS caseworker and Emmy's therapist warned Keira of the dangers of prenatal marijuana exposure,[5] but Keira did not heed the warnings. She told the OCS caseworker that marijuana "was a hard drug for her to stop because she had been using it for so long."

Jeremy was born in October 2014. At birth, his body temperature was unstable, and he had "jitters." He tested positive for marijuana. When Keira and Brayden tried to remove Jeremy from the hospital against medical advice, OCS took

---

[4]     *See* AS 47.10.142.

[5]     The OCS caseworker testified that the risks included the baby being born with a "small . . . weight, [an inability] to hold . . . body temperature, . . . [and] respiratory issues." Emmy's therapist testified that she warned Keira that prenatal marijuana exposure could "affect the development of the brain."

emergency custody. The superior court granted OCS's petition for temporary custody, and Jeremy was placed in foster care with the McKnights.

The superior court subsequently adjudicated both Emmy and Jeremy to be children in need of aid, on the parents' stipulation.[6]

## B. Keira's Case Plan Progress

Although initially uncooperative, Keira began working with OCS to remedy the problems that led to her children being taken away, namely substance abuse, domestic violence, and unsafe and unsanitary living conditions. In accordance with her OCS case plan, she submitted to random urinalysis (UA) testing for controlled substances. She also submitted to psychological and substance abuse evaluations. Following the recommendations of these evaluations, she went to counseling and attended substance abuse and domestic violence classes. She participated in the Resource Center for Parents and Children (RCPC) reunification program. As part of the RCPC program, Keira had regular supervised visitation with Emmy and Jeremy and took parenting classes. Keira also attended family therapy sessions with the children's therapist.

Keira's progress was slow at first. Although none of her UAs came back positive for methamphetamine, they were positive for marijuana until early 2015. By the spring of 2015, however, Keira had made considerable improvement. Her UAs were no longer positive for marijuana. And according to a June 2015 RCPC report, both Keira and Brayden had "developed an ability to parent [Emmy] and [Jeremy] safely and to provide substantial meals for the children." They now had "a safe home for the children."

---

[6]    *See* AS 47.10.011, .080.

## C. The Trial Home Visit

In light of this progress, OCS consented to hold in abeyance a previously filed petition for termination of parental rights. And in May 2015, OCS returned Emmy and Jeremy to their parents' custody for a "trial home visit." The children's therapist would later testify at the termination trial that "the whole team thought that the parents were in a . . . good place . . . , [that] the kids were in a good place and [that] it was time to reunite the family."

The transition of Emmy and Jeremy from foster care to their parents' care was faster than the children's therapist had recommended. But Keira and Brayden received support services to help them during the transition and during the trial home visit. In particular, the OCS caseworker visited the family's home, and RCPC provided Keira and Brayden with 90 days of in-home support services. The parents also had access to counseling services, and the children's therapist continued to work with the family.

However, during the trial home visit, Keira and Brayden withdrew from services. They were "discharged" from their domestic violence program because they had stopped attending classes, and they stopped seeing their substance abuse counselor. They also started missing appointments with the children's therapist and by August 2015 had stopped attending completely. The parents stopped answering their phones when the OCS caseworker called. And they resumed using marijuana.

The children's therapist testified at the termination trial that Emmy's and Jeremy's "hygiene . . . went down" during the trial home visit. The children had "bug bites from mosquitoes"[7] and sometimes "smell[ed] highly of smoke."[8] The therapist

---

[7]   According to the OCS caseworker, "[Jeremy] [was] covered pretty extensively [in bites] and . . . [Emmy's] looked maybe infected" due to an allergy to the

(continued...)

discussed these concerns with the parents. The OCS caseworker testified at trial that she "saw a regression" in the cleanliness of the family home starting in June 2015. She spoke to Keira and Brayden about her concerns, and "they said it was a kick in the butt, they were going to be able to . . . bounce back." But the cleanliness of the home further deteriorated. The OCS caseworker continued to counsel the parents about the need to keep their home clean and safe, but they did not remedy the problems.

Finally, in October 2015, "after multiple attempts for [Keira and Brayden] to clean up the home," OCS ended the trial home visit. The OCS caseworker testified at trial about the state of the home at the time of the children's removal. With regard to the outside of the home, she testified that there were many piles of trash surrounding the house, along with several containers containing liquids and possibly bodily fluids. And the inside of the home was filled with trash and unsanitary items such as piles of dirty dishes, old food, and soiled diapers. In addition, she found very little food and water in the home, which did not have a water system. The caseworker further described Emmy and Jeremy as "dirty" and stated that both were not clothed at the time of removal, even though it was late afternoon. Hair samples taken from both children shortly after their removal tested positive for marijuana. Emmy and Jeremy were returned to the custody of the McKnights.

### D.    Keira's Efforts After The Trial Home Visit

Keira continued to test positive for marijuana after the end of the trial home visit in October 2015. Around March 2016 her UAs became clean again. Since then,

---

[7]    (...continued)
bites.

[8]    The children's therapist testified that "secondhand smoke is not healthy with this age group."

neither she nor Brayden has tested positive for marijuana, but she tested positive for alcohol on four occasions.

Keira re-engaged in substance abuse counseling in November 2015 and was still "actively engaged" in late 2016, at the time of the termination trial. Keira was participating in the vocational rehabilitation program at the time of the termination trial but was not yet employed.

The condition of the home improved with the addition of electricity, a water tank, and an outhouse. But the home remained unsanitary. When the caseworker visited the home in May 2016, she observed that the trash piles and buckets full of fluid remained outside the home. And the inside of the home remained full of trash to the point where it was difficult to walk around. The OCS caseworker visited again in September 2016 — during the termination trial — and observed that the outside of the home was "somewhat better." But the "buckets full of fluids were still out there." The OCS caseworker testified about a "very foul smell" inside the home, describing it as "a mix between old food [and] urine."

### E.  The Termination Trial

OCS petitioned to terminate Keira's and Brayden's parental rights in February 2016. The termination trial was held in July and September 2016, when Emmy was about four years old and Jeremy about 22 months old.

The OCS caseworker testified at trial about her primary concerns regarding Keira and Brayden's prospects for the future and ability to care for the children:

> [T]hey haven't been able to sustain sobriety. They've minimized the safety concerns that were going on in the home. They weren't able to identify their children's regression [while in their care]. They . . . exposed their children to substances again. And the sanitariness of the home has not changed — and that's been three years. . . .

[E]ven with guidance, support, [and] professionals, . . . it's not changing.

The caseworker testified that "marijuana use . . . really affects this family."[9] Keira's alcohol use also concerned the caseworker. And her substance abuse counselor testified that alcohol "could possibly be a gateway to other substances" and that a person fighting substance abuse issues, as Keira was, should "ideal[ly] . . . abstain from all [mind-]altering substances."

The children's therapist testified that the children are "each show[ing] signs of some particular special needs." Jeremy had problems "self-regulat[ing]," and he was unusually active. Emmy was "tense and stressed a lot." As a result of her anxiety, she would "[s]cratch[] a lot," "pinch[] on herself," and bite "[j]ust anything she could find." The therapist diagnosed Emmy with adjustment and anxiety disorders. Emmy also had some speech delays.

The therapist testified that "removing" the children from the McKnights' care "and putting them back through another placement [with the parents] and hoping that it will work out would be . . . damaging toward [Emmy] mentally" and that Jeremy would also have "more problems" as a result of relocation. The therapist testified that "children between the ages of zero and five need stability" and that the fact that the children had already been removed "[m]ultiple times" (twice from their parents and once from the foster parents) was "an issue." The therapist testified that Keira and Brayden had "been making improvements, but it's . . . very slow." In her view, Emmy and Jeremy could not "wait for their parents." The OCS caseworker similarly testified that

---

[9] The caseworker explained: "[I]t's just like with any other drug or alcohol. Some families are able to do it and some families aren't able. And [when Keira and Brayden were using marijuana] they would be unemployed [and] their house would become increasingly unsanitary. . . . They were unable to communicate effectively. [Brayden] would have a harder time emotionally-regulating."

based on her ten years of experience in family services, she did not think that Emmy, in particular, could "sustain an additional removal."

## F.     The Order Terminating Parental Rights

The superior court terminated Keira's parental rights in a February 2017 order.  In relevant part, the superior court found Keira had caused Emmy and Jeremy to be children in need of aid by virtue of her substance abuse and neglect and that she had failed to remedy this conduct.  The court reasoned that Keira  "ha[d] not engaged in [her] case plan[]" and "ha[d] not made adequate progress in remedying [her] lack of parenting skills, [her] inability to provide for [her] children's basic needs, . . . or any of the other issues that brought the children into custody."  The court also concluded that OCS had made reasonable efforts to reunite the family.  The court reasoned that OCS provided visitation, taxis and bus passes, drug testing and substance abuse counseling, mental health referrals, and assistance with public housing applications, but that the parents "did not take advantage of those services."

## III.   STANDARD OF REVIEW

Whether a parent failed to remedy the conduct or the conditions that placed the child at substantial risk of harm is a factual finding that we review for clear error.[10] "Factual findings 'are clearly erroneous if review of the entire record leaves us with a definite and firm conviction that a mistake has been made.' "[11]  "Conflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence

---

[10]     *Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1273 (Alaska 2014).

[11]     *Id.* (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

when the record provides clear support for the superior court's ruling."[12] And "[w]hether OCS made reasonable efforts to reunify the family is a mixed question of law and fact."[13] When reviewing such mixed questions, "we review factual questions under the clearly erroneous standard and legal questions using our independent judgment."[14]

## IV. DISCUSSION

### A. The Superior Court's Failure-To-Remedy Finding Is Not Clearly Erroneous.

To terminate parental rights, the superior court must, among other things, find by clear and convincing evidence that (1) "the child has been subjected to conduct or conditions" that make him or her a child in need of aid under AS 47.10.011,[15] and that (2) the parent "has not remedied the conduct or conditions in the home that place the child at substantial risk of harm."[16] Keira does not challenge the superior court's finding that she subjected Emmy and Jeremy to conduct or conditions that rendered them in need of aid under AS 47.10.011(6), (8), (9), (10), and (11). But she argues that the superior court erred in finding that she did not remedy the conduct or conditions.

In assessing whether a parent has failed to remedy harmful conduct or conditions, "the court may consider [the] parent's history of harmful conduct 'as a

---

[12]    *Id.* (quoting *Sherman B.*, 290 P.3d at 428).

[13]    *Id.* at 1273-74 (quoting *Sherman B.*, 290 P.3d at 428).

[14]    *Id.* at 1274 (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018 (Alaska 2009)).

[15]    AS 47.10.088(a)(1).

[16]    AS 47.10.088(a)(2).

predictor of future behavior.' "[17] Moreover, "the court may consider any fact relating to the best interests of the child," such as

> (1) the likelihood of returning the child to the parent within a reasonable time . . . ;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions . . . ;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[18]

" '[R]easonable time' means a period of time that serves the best interests of the child, taking into account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[19] We must affirm the superior court's failure-to-remedy determination if we can affirm the determination with respect to "any of the conduct or conditions that led to a CINA finding."[20]

We conclude that the superior court did not clearly err in finding that Keira failed to remedy her substance abuse problems. The trial evidence showed, and the superior court found, that Keira was "actively and consistently" abusing drugs at the time of Emmy's removal. Keira was incoherent and her behavior erratic, and since Brayden was in a similar state, there was no sober caregiver for one-year-old Emmy. The home

---

[17] *Joy B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 382 P.3d 1154, 1163 (Alaska 2016) (quoting *Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 612 (Alaska 2016)).

[18] AS 47.10.088(b).

[19] AS 47.10.990(30).

[20] *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1114 (Alaska 2010).

was unsanitary and unsafe for a child. The court found that there was a causal link between the parents' drug use and the condition of the home, a finding supported by the evidence. Emmy tested positive for methamphetamine and marijuana at the time of her removal. Emmy's exposure to drugs and Keira's inability to adequately care for and protect her due to her drug use both support the superior court's finding that Keira's "use of intoxicants resulted in a substantial risk of harm to [Emmy]."

Keira was unable to cease her use of marijuana for well over a year after Emmy's removal, even though she should have known from her case plan how important it was to be drug free if she was going to get Emmy back. Keira continued to regularly smoke marijuana when she was pregnant with Jeremy, even though she was informed of the risks posed by prenatal marijuana exposure. Jeremy was consequently exposed to marijuana *in utero*.[21]

Although Keira eventually became clean, she began smoking marijuana again several months after the children were returned to her care. Keira's relapse is perhaps understandable given her long history of drug abuse. But it was not clear error for the superior court to find that Keira was "[un]motivated to protect the children from exposure to controlled substances" — especially given the caseworker's testimony that she warned Keira of the dangers that substance abuse posed to her parenting ability. Three-year-old Emmy and one-year-old Jeremy were further exposed to marijuana as a result of Keira's relapse, and the condition of the family's home and the hygiene of the

---

[21]     The superior court found that Jeremy's "prenatal exposure to cannabis . . . had a negative effect on [his] emotional health and behavior," a finding that Keira does not contest. *Cf. Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1259 (Alaska 2010) (holding that the mother's "drug use during her pregnancy [was] sufficient to find [the child] to be a child in need of aid").

children deteriorated, consequences that the superior court — based on the evidence — reasonably attributed to the parents' marijuana use.

Keira argues that she did remedy this conduct because by the time of the termination trial, she was no longer engaging in substance abuse. Although it is true that at the time of the trial Keira's UAs had not tested positive for marijuana for approximately six months, they did test positive for alcohol on several occasions during that period. Her recent alcohol use is especially concerning given her diagnosis of alcohol dependency and the testimony of her substance abuse counselor that Keira's alcohol use "could possibly be a gateway to other substances." Moreover, Keira has a long history of substance abuse and recurrent relapses. The superior court could thus properly find that the likelihood that Keira would stay clean was low and that there was a substantial chance that Keira would resume drug use. In light of this evidence, the superior court did not clearly err in finding that Keira had failed to remedy her substance abuse problem and that the children would face a substantial risk of harm if returned home.[22]

We conclude that the evidence showing that Keira failed to remedy her substance abuse problem also supports the superior court's conclusion that Keira failed to remedy the conduct or conditions that subjected the children to neglect.[23] There was evidence that Keira's marijuana and methamphetamine use caused her to inadequately

---

[22]     *See Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 902-03 (Alaska 2003) (holding that the superior court did not clearly err in finding that the parent had not remedied her substance abuse despite maintaining a year of sobriety, as the parent had a long history of substance abuse and had made recent poor decisions).

[23]     AS 47.10.011(9).

supervise Emmy prior to Emmy's removal in 2013[24] and made it difficult for her to keep the family's home in a condition safe and suitable for children.[25] There was evidence that both the outside and inside of the home contained numerous hazards for children. There was also evidence that the children's hygiene declined while Keira was using marijuana. Because Keira did not remedy her substance abuse problem, this neglect persisted.

### B. The Superior Court's Reasonable-Efforts Finding Is Not Clearly Erroneous.

To terminate parental rights, the superior court must find by clear and convincing evidence that OCS has "ma[d]e timely, reasonable efforts to provide family support services . . . designed to . . . enable the safe return of the child to the family home."[26] The court must find that OCS "identif[ied] family support services" and "actively offer[ed]" these services to the parent by referring the parent to the services.[27]

The superior court did not clearly err in finding that OCS made the requisite reasonable efforts. OCS, in accordance with the case plans it produced, referred Keira

---

[24] *Cf. A.B. v. State, Dep't of Health & Soc. Servs.*, 7 P.3d 946, 952 n.14 (Alaska 2000) (explaining that the parent's act of leaving the child in the care of "someone he believed to be a highly inadequate" caregiver "placed [the child] at a substantial risk of suffering substantial physical harm").

[25] *See Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 674 (Alaska 2008) (affirming the superior court's neglect finding where, *inter alia*, there were "piles of dirty clothes and . . . broken glass on the floor," "dirty dishes piled in a non-functioning sink and alcohol bottles all over the home, as well as the evidence that the [children] were exposed to illegal drug use and open sexual activity" — the evidence supported an inference that the parent was "not capable of doing the normal day-to-day things").

[26] AS 47.10.086(a), .088(a)(3).

[27] AS 47.10.086(a)(1), (2).

to and paid for her participation in psychological evaluations, domestic violence evaluations, domestic violence classes, substance abuse evaluations, therapy, and the RCPC reunification program. OCS also referred Emmy and Jeremy to a therapist, who also began seeing Keira and Brayden in family sessions. OCS offered visitation to the parents after the trial home visit ended. And it provided Keira with food, clothing, transportation, and some assistance obtaining public housing. Once the parents became sober the first time, OCS consented to hold the termination trial in abeyance and ultimately allowed the children to be returned for a trial home visit. OCS continued to provide services until the end of the case. The foregoing is sufficient evidence to support a determination that OCS made reasonable efforts to reunify the family.[28] Further, although the parents were generally cooperative through much of the case, the court did not clearly err in holding it against them that they withdrew from various services.

Keira counters that OCS failed to make reasonable efforts during and after the trial home visit. She argues that because prior to the trial home visit she showed she was capable of remedying her conduct, OCS should have provided her with more support and referrals during this critical time. However, Keira fails to acknowledge that she withdrew from services during this time, decreased her communication and cooperation with OCS, and resumed regular marijuana use. The superior court was permitted to take into account Keira's lack of participation in the services provided in its

---

[28] *See Sherry R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 332 P.3d 1268, 1277-78 (Alaska 2014) (holding that OCS made reasonable efforts where it provided the parent with "repeated . . . counseling, parenting education, case planning, visitation, encouragement, and support" (omission in original)); *see also Shirley M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 342 P.3d 1233, 1242 (Alaska 2015) (holding that OCS made reasonable efforts where it provided parenting training, psychological evaluations and treatment, substance abuse assessment and therapy, and other services).

reasonable efforts analysis.[29] Moreover, "[r]eunification efforts need not be perfect, only reasonable in light of the circumstances."[30] Given the circumstances here, the superior court did not err in concluding that OCS on the whole made reasonable efforts to reunify Keira with Emmy and Jeremy.

## V. CONCLUSION

We AFFIRM the superior court's termination of Keira's parental rights.

---

[29] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 850 (Alaska 2014).

[30] *Amy M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 320 P.3d 253, 259 (Alaska 2013).