NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JEAN B., | ) | |
| | ) | Supreme Court No. S-17176 |
| Appellant, | ) | |
| | ) | Superior Court Nos. 4FA-17-00029/ |
| v. | ) | 00030 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT, | ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | No. *1736* – August 7, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Jane F. Kauvar, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Kathryn Vogel, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee. Carol L. Jacoby, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Stowers, and Maassen, Justices. [Carney, Justice, not participating.]

## I.    INTRODUCTION

In 2016 the Office of Children's Services (OCS) took custody of two children due to their mother's substance abuse, domestic violence, and neglect. OCS had

---

\*       Entered under Alaska Appellate Rule 214.

been involved with the mother on and off since 2001; she had a history of engaging in treatment but then relapsing once OCS returned her children to her care. In May 2018 the superior court terminated the mother's rights to her two children. The mother appeals, arguing that the superior court erred by finding that she failed to remedy in a reasonable time the conduct that made her children in need of aid. The superior court did not clearly err in its failure-to-remedy finding, and we affirm the termination of the mother's rights to her two children.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Jean B. is the mother of Amy and Dan, who were ages 11 and 5 at the time of the termination trial.[1] Jean is affiliated with the Allakaket Village (the Tribe), a federally recognized Alaska Native tribe, and Amy and Dan are Indian children within the meaning of the Indian Child Welfare Act (ICWA).[2] Joe S. is the biological father of Dan, and he raised Amy from a young age.[3] Joe relinquished his parental rights to Dan and his three other children the week before the termination trial; his rights are not at issue in this appeal.

### 1.    Past OCS history — 2001 through 2014

Jean has a long history with OCS. OCS first became involved with her family in 2001 when it created a safety plan for Jean's oldest daughter Trish, who is now an adult. In March 2007 OCS became involved again when Amy was born with cocaine in her system; Jean admitted to using cocaine while pregnant. OCS also had concerns

---

[1]    We use pseudonyms to protect the family's privacy.

[2]    *See* 25 U.S.C. § 1903(4) (2018).

[3]    The parental rights of Amy's biological father were terminated in May 2018. His rights are not at issue in this appeal.

that there was domestic violence between Amy's father and Jean. OCS assumed custody of Amy but closed its case in spring 2009 after Jean completed substance abuse treatment, parenting education, and domestic violence education.

In September 2010 Jean was arrested for felony driving under the influence and was sentenced to 27 months incarceration. She completed a substance abuse treatment program during her incarceration. When Jean was first arrested, she, Amy, and Trish were living with Joe; the children were eventually moved to Jean's mother's care. OCS took custody of the children after it received a substantiated report in October 2010 that Amy, then three years old, had been sexually abused. The children were returned to Jean in spring 2012, and Dan was born to Jean and Joe in August.

In November 2013 Jean was arrested for punching Joe and pleaded guilty to assault in the fourth degree. In August 2014 Jean was arrested for hitting Joe's then-nine-year-old daughter while Jean was intoxicated, and she pleaded guilty to harassment. Jean served time for both offenses. OCS again became involved with the family after the 2014 incident, and it offered an in-home safety plan with counseling for the children, a domestic violence assessment, a substance abuse assessment and urinalysis testing, and intensive in-home parenting education. Jean engaged in individual counseling, and Jean and Joe participated in the in-home parenting program. Jean also completed a LEAP[4] assessment in December 2014 and began LEAP's domestic violence education program in January 2015; she attended 27 out of 36 classes but she did not complete the program. OCS eventually closed its case because the parents made progress in addressing its concerns.

_____

[4] LEAP is an alternatives-to-violence program.

### 2. OCS custody — 2016 to 2018

In January 2016 OCS assumed custody of Amy and Dan, as well as Joe's three daughters, after Joe's then-five-year-old daughter was sexually assaulted by a social guest in the home. The children were initially returned home to Joe as part of a safety plan where Joe's father would also live in the home and supervise the family; Jean agreed to live elsewhere and was not permitted to have unsupervised contact with the children.

In May 2016 Jean completed a second LEAP domestic violence assessment that recommended she re-engage in domestic violence education and complete the LEAP program. But Jean did not re-engage in the LEAP program at this time. Jean began substance abuse treatment in June 2016, and she also engaged in family visitation and parenting education. Jean initially utilized an ankle-monitoring system to track alcohol consumption, and then OCS arranged urinalysis testing that Jean participated in through September 2016. But seven of the nine urinalysis tests she completed were "dilute," which OCS considers to be positive tests. She was additionally offered individual and couples' counseling but did not participate in either. Amy and Dan were provided therapy during this time, and Amy was diagnosed with chronic post-traumatic stress disorder (PTSD). Hair follicle tests conducted of Amy and Dan in spring 2016 showed that they had both been exposed to illicit substances.

In July 2016 the Tribe assumed jurisdiction over Amy's and Dan's cases. But the Tribe relinquished jurisdiction in February 2017 as funding issues limited the Tribe's ability to manage the cases. OCS immediately petitioned to adjudicate Amy and Dan as children in need of aid, and a temporary custody order was entered in February 2017. After OCS re-assumed custody, Jean was provided a parental risk assessment in June 2017, a third LEAP assessment in August 2017, a new case plan in March 2018, and referrals for a new substance abuse assessment and individual counseling. Jean

attended seven LEAP classes in fall 2017 and two individual counseling sessions in spring 2018. OCS generally found Jean to be hostile and difficult to work with during this time; a caseworker testified that Jean's communication was sporadic and she would rarely meet with OCS or sign case plans.

**B.      Proceedings**

Amy and Dan were adjudicated as children in need of aid in November 2017. A week later OCS filed its petition for termination of parental rights. The termination trial took place over three days in late April and early May 2018.

**1.      The termination trial**

At the termination trial, the superior court heard testimony from (1) six OCS caseworkers regarding the services provided to Jean from 2001 to 2018; (2) an Allakaket Village tribal administrator and ICWA worker regarding the Tribe's involvement in the case; (3) therapists for the children regarding their diagnoses and emotional needs; (4) Jean's service providers regarding their evaluations and recommendations and Jean's progress; and (5) Jean herself.

The current OCS caseworker, who began working with Jean in February 2018, testified that Jean attended two counseling appointments but otherwise did not engage in her case plan. She also testified to an incident in March where Jean and Joe failed to show up for a joint visit for Amy's birthday. Joe had been drinking, the couple began to fight, and the police eventually intervened.

The Tribe's ICWA worker testified that Jean is "still recovering . . . [but she knows] why this has happened" and that Jean is willing to "seek services that can regain her full potential back to care for her children." She stated that Jean is "a great mother, a great caretaker, but there are some obstacles in the way." At the time of the trial, the Tribe had yet to decide whether it considered termination of Jean's parental rights to be in Amy's and Dan's best interests.

Dan's therapist from April to December 2017 testified that Dan had anxious, hyperactive, and aggressive behavior. He noted that Dan's expression of needs was below his social and emotional developmental stage, and Dan would regress around his family. Dan's therapist also testified that being returned to an environment with domestic violence would be a major risk to Dan's development, wellness, and safety.

Amy's therapist testified that Amy was diagnosed with chronic PTSD and had a history of complex trauma. In particular, Amy was afraid that Jean would hurt her siblings but was conflicted because she also wanted to be returned to her mother. Amy's therapist testified about her initial impressions of Amy: "[S]he experienced numbness, she was very shut down. She had difficulty trusting people, had a difficult time processing events or making sense of past events." Despite significant progress, the therapist noted that Amy still had a difficult time trusting others, struggled to concentrate in school, had nightmares and sleep problems, and experienced episodes where she would withdraw and shut down. She also noted that Amy had sexual acting-out behaviors and had boundary issues with adult men. The therapist concluded that being returned to Jean would be very detrimental to Amy. She testified that Amy "very much needs permanency. She needs to know where she's going to be living long-term. She needs to work on trusting adults in her life that they will take care of her."

The LEAP program operator testified to Jean's participation in the LEAP program in 2015 — when she completed 27 out of 36 classes — and again in 2017 when she completed 7 classes. She testified that Jean was an active participant in the program who learned and increased her insight. But she also testified that Jean had not fully integrated what she learned and that Jean continued to engage in negative behaviors.

A psychologist who conducted two parental risk assessments of Jean — one in 2008 and one in 2017 — testified that Jean is "a fairly self-centered, overconfident, kind of dramatic person who tends to present herself to others in sometimes even an

intimidating fashion." She also noted that Jean is "prone to be[ing] pretty inconsiderate of others and tends not to be particularly concerned about their wants, needs, rights, feelings." She also found that Jean "has a hard time learning from her experiences . . . [and] tends to make the same mistakes over and over." She said that Jean is "pretty self-deceptive, and she's really good at making sort of plausible rationales for her own kind of misbehavior." The psychologist also noted concerns that Jean's substance abuse was associated with criminal behavior and violent conduct and that she "didn't see a whole lot of evidence that [Jean] had been able to successfully address her addiction."

Jean testified regarding the treatment she had engaged in and the positive impact it had on her. She testified that she had been sober, except for marijuana usage, since October 2017 and that she had not hit Joe since January 2016. She stated that domestic violence was no longer an issue in their relationship. Jean acknowledged that the children were afraid of her and stated, "[I]t's just like if you beat a dog all the time, it's going to flinch when you walk by." Jean indicated that she was not yet ready to parent her children but thought undergoing EMDR (eye movement desensitization and reprocessing) treatment[5] with her new individual counselor and maintaining family visitation would enable her to eventually be a successful parent. Jean placed significant blame on OCS and said she felt she would be more successful with a clean slate and an unbiased caseworker.

## 2. The termination order

The superior court issued its termination order in May 2018 and provided a written decision with its findings of fact in July. The court found that Amy and Dan were children in need of aid under AS 47.10.011 subsections (6) (physical harm),

---

[5]     EMDR "is a psychotherapy that enables people to heal from the symptoms and emotional distress that are the result of disturbing life experiences." *What is EMDR?*, EMDR INST., INC., https://www.emdr.com/what-is-emdr (last visited July 10, 2019).

(8) (mental injury due to domestic violence), (9) (neglect), and (10) (substance abuse). The court also found that Jean failed to remedy her conduct in a reasonable time and that returning Amy and Dan to her care would place them at substantial risk of harm, that active but unsuccessful reunification efforts had been made, that Jean's continued custody of Amy and Dan was likely to result in serious physical or emotional damage to the children, and that terminating Jean's parental rights was in the children's best interests.

Jean appeals the superior court's finding that she did not remedy the conduct that placed her children at risk of harm within a reasonable time. She asks us to reverse the termination of her parental rights and remand for further proceedings.

## III. STANDARD OF REVIEW

Whether a parent failed to remedy her conduct in a reasonable period of time is a factual finding.[6] In child in need of aid (CINA) cases, we review the superior court's factual findings for clear error.[7] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[8] But "[c]onflicting evidence is generally insufficient to overturn the superior court, and we will not reweigh evidence when the record provides clear support for the superior court's ruling."[9]

---

[6]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012).

[7]     *Id.* at 427.

[8]     *Id.* at 427-28 (quoting *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[9]     *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (footnote omitted).

## IV.    THE SUPERIOR COURT DID NOT CLEARLY ERR BY FINDING THAT JEAN FAILED TO REMEDY HER CONDUCT IN A REASONABLE TIME.

To terminate parental rights, the superior court must find by clear and convincing evidence that the parent has not remedied, within a reasonable period of time, the conduct that placed the child at substantial risk of harm.[10]  A "reasonable time" is statutorily defined as "a period of time that serves the best interests of the child, taking in account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[11]  In "making a [failure-to-remedy] determination . . . the court may consider any fact relating to the best interests of the child."[12]  The key question is "whether [the mother] remedied the problems that placed her children at risk and gained the necessary skills so that the children could be safely returned to her care."[13]

Jean argues that (1) the superior court erred in failing to consider the children's "native heritage and culture" when determining whether the amount of time to remedy was reasonable; (2) the LEAP program operator believed in Jean's ability to change her conduct; (3) Jean demonstrated at trial that she had learned and grown from treatment; (4) her bond with her children remained strong; and (5) her relationship with the new OCS caseworker improved her prospects for change.  She asserts that she "was on her way to remedying her conduct" and that "[t]he court erroneously cut short the process and [her] progress."

---

[10]    AS 47.10.088(a)(2)(B).

[11]    AS 47.10.990(30).

[12]    AS 47.10.088(b).

[13]    *Barbara P.*, 234 P.3d at 1260.

Jean does not cite to any case law or ICWA provision that supports her argument that her children's status as Indian children should inform whether the time given her to remedy her conduct was reasonable. The requirement to remedy within a reasonable time is provided by the CINA statutes; it is not tied to ICWA requirements.[14] To terminate parental rights to an Indian child, ICWA adds the additional requirements that OCS must make active efforts and that OCS must show by evidence beyond a reasonable doubt that the parent's continued custody of the child is likely to result in serious emotional or physical damage to the child.[15] Consideration of a child's status as an Indian child is not required when making a failure-to-remedy finding.[16]

Jean's other arguments are also without merit; she mischaracterizes the record and essentially asks us to reweigh evidence. But even accepting her characterizations as accurate, the evidence supports the superior court's finding that Jean did not demonstrate that she remedied, in a reasonable time, the conduct that put her children at risk of harm. As she herself indicated at trial, she was not yet ready for the children to be returned to her care. And it is unclear when, if ever, she would be able to successfully parent Amy and Dan. OCS notes that it has been involved with Jean on and off for 18 years, yet she has continued to engage in significant domestic violence and substance abuse. Throughout Amy's life, Jean has participated in three substance abuse treatment programs, three LEAP behavioral risk assessments and thirty-four domestic violence classes, two parental risk assessments and at least three parenting education

---

[14] *Compare* AS 47.10.088(a)(2)(B) (describing failure-to-remedy requirement), *and* AS 47.10.990(30) (defining "reasonable time"), *with* 25 U.S.C. § 1912 (2018) (absence of failure-to-remedy requirement).

[15] *See* 25 U.S.C. § 1912(d), (f); *see also* CINA Rule 18(c)(2)(B), (c)(4).

[16] *See* AS 47.10.088(a)(2)(B); *see also* CINA Rule 18(c)(1)(A)(ii).

programs, and has engaged intermittently in individual counseling. Despite these activities, Jean testified that she has "retained as much information that [she] can, and something's not working." Her failure to remedy is further illustrated by the incident only a month and a half before the termination trial where Jean and Joe engaged in a fight related to substance abuse that resulted in police intervention and missed visitation with Amy.

We also note that Jean's arguments focus on her need for more time but do not acknowledge the impact of extended impermanency on Amy and Dan. A "reasonable time" is not defined by "reference to parents' needs"[17] — we have "repeatedly recognized that a child's need for permanence and stability should not be put on hold indefinitely while the child's parents seek to rectify the circumstances that cause their children to be in need of aid."[18] It is clear that Amy and Dan both need permanence and stability. As the superior court found, "the evidence presented as to the children's trauma is profound and alarming." The children's therapists both testified that returning Amy and Dan to Jean would be detrimental to the children and that Amy in particular needed permanence to overcome her complex trauma and trust issues.

This is not a close case; the superior court did not clearly err by finding that Jean failed to remedy, within a reasonable period of time, the conduct that placed her children at substantial risk of harm.

## V. CONCLUSION

We AFFIRM the termination of Jean's parental rights to Amy and Dan.

---

[17] *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1107 (Alaska 2011).

[18] *Kent V. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 233 P.3d 597, 603 (Alaska 2010).