*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| PENN P. JR., ) | |
| ) | Supreme Court No. S-18220 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-18-00592 CN |
| v. ) | |
| ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT) | |
| OF HEALTH & SOCIAL SERVICES,) | No. 7638 – January 6, 2023 |
| OFFICE OF CHILDREN'S SERVICES,) | |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Renee McFarland, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee Office of Children's Services. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Appellee Guardian ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

The Office of Children's Services (OCS) took custody of a newborn child due to concerns about the parents' drug use and the father's history of sexual abuse. The

mother later voluntarily relinquished her parental rights, and the superior court terminated the father's rights following a trial. The father appeals the termination order, making two primary arguments. First, he argues that the order improperly relied on drug-treatment records that were not admitted at trial. Second, he proposes a new process to govern a parent's claim of ineffective assistance of counsel; applying this process, he argues that he has established a prima facie case of ineffective assistance and we should remand the case to the superior court for an evidentiary hearing. We are not convinced by either argument. We affirm the termination order because relying on the unadmitted drug-treatment records was harmless error and because the father has not shown that he received ineffective assistance of counsel. However, we take this opportunity to clarify our approach to ineffective assistance claims in child in need of aid (CINA) cases.

## II.    FACTS AND PROCEEDINGS

### A.    OCS's Custody Of Ruby

Ruby was born in November 2018 to Penn and June,[1] who had earlier lost their parental rights to two other children. The day after Ruby's birth, OCS received a report that June had tested positive for amphetamines.[2] An OCS caseworker visited the family at the hospital, where June expressed concern that she would not be able to take care of Ruby. June and Penn both told the caseworker that June had gotten very sick from methamphetamine use in February of that year, and June reported to hospital staff that she was using drugs and having difficulty quitting. Penn told the caseworker that he too had used methamphetamine in an effort to keep June around.

Penn also told the caseworker that he had previously been charged with

---

[1]    Pseudonyms are used for the family members to protect their privacy.

[2]    This test was apparently later determined to be a false positive.

sexual abuse of a minor in the first degree and was a registered sex offender.[3]  But Penn said he had created what the caseworker referred to as Penn's own "safety plan" for being around children:  he would not change a diaper or bathe an infant, and if he felt he was a threat to his child he would contact the doctor he had worked with in his sex offender treatment.

The caseworker had a team decision-making meeting with Penn and June at which both parents reported that they were struggling with methamphetamine cravings.  OCS then took emergency custody of Ruby and filed an emergency petition seeking temporary custody.  Ruby was eventually placed with the family who had already adopted June and Penn's two older children, and she still lived with them at the time of trial.

B.    OCS's Services To Penn And June

The OCS caseworker scheduled both parents for urinalysis (UAs) and discussed with them their options for substance abuse treatment.  Between November 2018 and December 2019 Penn missed many of his scheduled UAs.  When he did show up he always tested positive for marijuana; on three occasions he also tested positive for methamphetamine (in November and December 2018 and April 2019).[4]  The first caseworker testified at trial that both Penn and June "would test and then they would stop testing for weeks at a time sometimes."

In January 2019 the case was transferred to a new caseworker.  She had a

---

[3]    Penn was actually convicted of the offense, which occurred in 2003 against a minor in his own household.

[4]    The superior court's findings included the statement that when Penn did undergo urinalysis, "he alternated between positive tests (showing marijuana) and negative tests."  As the guardian ad litem (GAL) notes, this was incorrect; "in all of the UA's Penn completed . . . no UA was ever negative; he was either positive for marijuana and methamphetamine or solely marijuana."

case transfer meeting with the initial caseworker and identified the areas of concern as substance abuse, Penn's history of sexual abuse, and June's mental health struggles. June and Penn "admitted [to her] that they used methamphetamine on a pretty regular basis."

The new caseworker met with Penn in early February. He told her he had used methamphetamine two days before. He initially declined a substance abuse assessment, but later in the meeting he said he would get one through Cook Inlet Tribal Council (CITC). Penn's case plan called for him to participate in a substance abuse assessment and follow its recommendations, participate in the random UA program, participate in a sex offender assessment and follow its recommendations, have family contact with Ruby, and attend her doctor appointments when possible.

The caseworker made a referral to CITC, where Penn had a substance abuse assessment in February. He was recommended for intensive outpatient treatment but could not receive it through CITC because of his criminal history. The caseworker talked to him about other treatment options and offered to help him call programs, but he repeatedly declined her assistance and said he would contact the programs himself.

Penn and June both met with the caseworker in May 2019. Penn acknowledged that he had used drugs two weeks before and had not engaged in any substance abuse treatment. He said he had missed UAs due to working double shifts, and he acknowledged a recent positive UA. In a June meeting both parents admitted to recent methamphetamine use; Penn explained that June became irritable when she had a craving and so he would get methamphetamine for her and they would use it together. Penn said he was not planning to seek substance abuse treatment and did not want UAs, but he was attending sobriety meetings. The caseworker also raised the possibility of a sex offender assessment for Penn, but, according to the caseworker's later testimony, he declined to undergo an assessment with anyone other than the doctor who had treated

him before, and that doctor was no longer performing assessments. Penn disputed this testimony. He said he agreed to get a sex offender assessment from a different provider, but he was not able to make it to his scheduled appointment (around February 2020) due to a lack of transportation.

The caseworker met with Penn again in August, when Penn said he would contact providers for the recommended substance abuse treatment. He said he had abstained from drugs for a week and again agreed to attend his UAs, but he still refused to undergo an updated sex offender assessment.

By September Penn's initial substance abuse assessment was outdated; at his request the caseworker gave him a referral to Akeela, a substance abuse treatment facility. Penn told the caseworker he had not used methamphetamine "in a while." As of November he and June were living in his vehicle and had been denied several housing applications because of his criminal history. Penn encountered complications arranging the Akeela assessment, but it was finally completed in December.

Penn received a copy of the assessment in February 2020. It recommended residential treatment, which he did not want. He asked for a third substance abuse assessment, but OCS denied his request because the Akeela assessment was still current, he had not followed through with its recommendations, and he was not attending UAs.

Penn spoke with the caseworker at the end of March. He again expressed interest in a new substance abuse assessment and said he was pursuing one through CITC. The caseworker told him to let her know once he had spoken with CITC, and then she would send over any necessary materials.

At this point, the caseworker's contact with Penn "kind of dropped off." They spoke again in August 2020; Penn told her that he and June were still using drugs as recently as the night before. He again expressed interest in another substance abuse assessment; the caseworker said she would help him with a referral once he spoke

with CITC.

The caseworker called Penn in December 2020 but his phone was not working. She next spoke with him by phone in January 2021. Penn reported that June had experienced a psychotic episode and been admitted to the Alaska Psychiatric Institute several times over the last few months; at trial he explained that she had run out of medication and they were not able to get to her doctor. The caseworker testified that during this phone call June was "yelling incoherently" in the background. The caseworker told Penn that if he wanted custody of Ruby, his current living situation was "very unhealthy." Penn said he had not used drugs over the last few months but June "was still using quite frequently." He also said he was still trying to get an updated substance abuse assessment from CITC, was attending sobriety meetings, and was willing to restart UAs. But he did not attend the subsequent UA appointments after the caseworker made a referral.

June's medical records, which were admitted at trial, showed continued mental health struggles, a suicide attempt, and drug use during early 2021. Penn testified that by February she was doing much better, was back on her medication, and was seeing her doctor every two weeks. In March Penn told the caseworker that he and June were still living together and it had been a few months since he last used drugs.

Throughout the case Penn engaged in regular visitation with Ruby. He had in-person, supervised visits at OCS for most of the case and only missed a few. When the pandemic began, the visits shifted to 15-minute virtual visits, which also went well. His interactions with Ruby's foster family were consistently appropriate.

## C. Termination Trial

A termination trial was held in April and May 2021. OCS designated 29 trial exhibits. On the trial's first day June agreed to relinquish her parental rights, and Penn's attorney requested a continuance, in part to review OCS's exhibits. The court

took the testimony of the OCS caseworker who had first made contact with Penn and June, then continued the trial to the next month.

When the trial resumed, OCS moved to admit 19 exhibits into evidence, explaining that June's relinquishment of her parental rights made the others unnecessary. The exhibits were admitted without objection. The court then heard testimony from the second OCS caseworker, Ruby's foster mother, and Penn. In October the court issued an order terminating Penn's parental rights. After he appealed, we remanded the case for more specific findings.

The superior court's amended termination order, issued in January 2022, contained more detailed findings of fact and conclusions of law. The court found that Ruby was a child in need of aid due to Penn's substance abuse[5] and a substantial risk of substantial physical harm due to Penn's ongoing relationship with June and his history of sexual abuse.[6] It found that Penn had failed to remedy the conduct that caused Ruby to be a child in need of aid, that OCS had made reasonable efforts to reunite the family, and that termination of Penn's parental rights was in Ruby's best interests.

Penn again appeals the termination order.

## III. STANDARDS OF REVIEW

"[W]e review a trial court's factual findings for clear error."[7] "Factual findings are clearly erroneous if review of the entire record leaves us with 'a definite and

---

[5] *See* AS 47.10.011(10).

[6] *See* AS 47.10.011(6).

[7] *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1264 (Alaska 2014).

firm conviction that a mistake has been made.' "[8] We review questions of law de novo.[9] "Whether a parent's due process right to receive effective assistance of counsel was violated is a question of law."[10]

## IV.   DISCUSSION

### A.   The Superior Court's Reliance On Unadmitted Exhibits Was Harmless Error.

Penn first challenges the superior court's reliance on Exhibit 12, June's urinalysis records.[11] The parties agree that this exhibit was neither offered into evidence nor admitted. The court discussed June's 2018 and 2019 urinalysis results in a general background section of the amended termination order called "Findings in Support of Termination." It noted that she often missed scheduled tests and that when she did attend, "she alternated between positive tests (showing marijuana) and negative tests." The court cited one "positive-dilute" test for methamphetamine, from December 26, 2019. And it tied this information to Penn's parental rights, writing that June's "pattern of usage is relevant to the allegations against [Penn] because the parents remained living together in the same household. In addition, [Penn] acknowledged to OCS that he

---

**8**       *Id.* (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

**9**       *Id.*

**10**      *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 856 (Alaska 2013).

**11**      Penn notes that the termination order also mentioned Exhibit 9, OCS's case plan for June, which was also not admitted. Although he argues that this "undermined the fairness of the process," he also acknowledges that the superior court "does not substantively discuss [the case plan] or otherwise rely on it in its amended order." Penn does not show that the court's possible reliance on this document could have been prejudicial.

continued to supply [June] with drugs during their relationship in order to keep her around."[12]

The superior court also discussed June's urinalysis records in its finding that Ruby was a child in need of aid under AS 47.10.011(6) due to a substantial risk of substantial physical harm. The court based this finding in part on Penn's "ongoing substance abuse issues," but it wrote, "[I]t is equally important that [Penn] is continuing his relationship with [June] whose substance abuse, mental health[,] and related issues very clearly place her children at risk."

When the superior court must "make specific factual findings and legal conclusions [in a CINA case,] . . . the court's decision must be based only upon evidence admitted pursuant to legal rules."[13] Because June's urinalysis records were not admitted, it was error for the superior court to rely on them.

Our next step, however, is to determine whether that error was prejudicial.[14] "In making our determination we 'disregard any error or defect in the proceeding which does not affect the substantial rights of the parties' and act only when the result is

---

[12] Penn disputes the superior court's statement that he had "acknowledged to OCS that he continued to supply [June] with drugs during their relationship in order to keep her around," arguing that this "misunderstands the evidence admitted at trial." As Penn notes, however, the caseworker testified that he told her in June 2019 that he would get methamphetamine for June when she was irritable and having cravings, and the initial OCS caseworker testified that Penn said he had used methamphetamine in 2016 "to keep [June] around." Given this evidence, we cannot say that the superior court's factual finding is clearly erroneous.

[13] *Diego K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 411 P.3d 622, 629 (Alaska 2018).

[14] *In re Rabi R.*, 468 P.3d 721, 732 (Alaska 2020); Alaska R. Civ. P. 61.

otherwise 'inconsistent with substantial justice.' "[15]  "The inquiry cannot be merely whether there was enough [evidence] to support the result, apart from the phase affected by the error.  It is rather, even so, whether the error itself had substantial influence."[16] The burden is on the party alleging error.[17]

Penn argues that the court's consideration of June's urinalysis records was not harmless because "[a]bsent the unadmitted urinalyses records, which spanned from November 2018 to February 2020 . . . , there was little information presented to the court regarding June's substance use throughout that time period."  He contends that "the admitted evidence at trial demonstrated only one instance of use during 2019," and that "because the trial court concluded that June's drug use was relevant to Penn's fitness as a parent, the trial court's reliance on this unadmitted evidence was not harmless."

We disagree.  Considerable evidence in the record supported the court's finding that June continued to use drugs throughout the case, including testimony from the OCS workers[18] and June's Southcentral Foundation medical records, which were

---

[15]     *Rabi R.*, 468 P.3d at 732 (quoting Alaska R. Civ. P. 61)).

[16]     *Martinez v. Bullock*, 535 P.2d 1200, 1206 (Alaska 1975) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)) (adopting that principle "in evaluating the importance of errors in civil cases").

[17]     *Dobos v. Ingersoll*, 9 P.3d 1020, 1024 (Alaska 2000).

[18]     The first caseworker testified that June said she was struggling with drug addiction when Ruby was born in November 2018.  The next caseworker testified that Penn and June told her in June 2019 that they had recently used methamphetamine, that Penn told her in August 2020 that he and June were "still using drugs here and there" and had used the night before, and that Penn told her in January 2021 that June "was still using [drugs] quite frequently."  Penn acknowledges the relevant testimony in his briefing.

properly admitted.[19] Although Penn is correct that there is less evidence of June's drug use in the time period covered by the urinalysis records, there is some testimony about that time, considerable testimony about before and after, and no evidence that June ever stopped. Additionally, as the superior court observed, the urinalysis records themselves showed only one positive test for methamphetamine and therefore added little to the court's finding about June's continuing drug use. We conclude that the court's consideration of June's urinalysis records was harmless.[20]

B. **Penn Has Not Shown That His Attorney's Failure To Object To Certain Evidence At Trial Constituted Ineffective Assistance Of Counsel**.

Penn contends that of the 19 OCS exhibits admitted at trial, some "included documents that contained inadmissible hearsay[,] [a]nd others contained expert reports

---

[19] Penn also argues that the presence of other admissible evidence showing June's drug use should not render this error harmless, because the trial court did not rely on this admissible evidence in its decision. We reject this contention. *See In re Rabi R.*, 468 P.3d at 733 (holding that where "other evidence in the record provides ample support for the [trial] court's conclusion," "[a]lthough it was error to rely to any extent upon the . . . allegations contained only in the [unadmitted evidence], the error was harmless").

[20] We also note that there were other separate and sufficient bases — beyond June's drug use — supporting the finding that Ruby would be subject to a substantial risk of substantial physical harm if Penn received custody: "the ongoing substance abuse issues of [Penn]" and "[Penn's] sexual abuse history and unwillingness to follow through on the request to obtain a further assessment." Penn does not challenge these findings. Furthermore, the superior court's finding that Ruby was a child in need of aid relied not just on substantial risk of substantial physical harm under AS 47.10.011(6) but also parental substance abuse under AS 47.10.011(10), based on Penn's drug use. *See Alyssa B. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 165 P.3d 605, 618 (Alaska 2007) (holding that because court may find that child is in need of aid based on one ground, appeal of only one of multiple grounds for CINA status cannot change result).

that might have been admissible, in whole or in part, had the report's writer testified but were admitted without any testimony from the expert." Penn's lawyer did not object to any of these exhibits when they were offered, and Penn argues that this demonstrates a prima facie case of ineffective assistance of counsel. Penn focuses on June's domestic violence allegations against him in a petition for a protective order; the underlying complaint from Penn's conviction for sexual abuse of a minor; June's allegations of abuse by Penn contained in records from a domestic violence shelter; unsupported hearsay regarding Penn's history of sexual abuse and misbehavior in a 2008 risk assessment by Dr. Anthony Mander; and similar unsupported hearsay in a more recent evaluation by Dr. David Truhn. Regarding the latter two exhibits, Penn acknowledges that the two psychologists could have testified to some hearsay contained in their reports, as experts may rely on facts not admissible as evidence where those facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[21] But neither psychologist testified. Penn argues that he has shown a prima facie case of ineffective assistance of counsel and asks us to remand to the superior court for an evidentiary hearing on the issue.

As Penn points out, a parent in a CINA case, "[l]ike an individual being prosecuted for a crime, . . . has a constitutional right to the effective assistance of counsel in a proceeding to terminate parental rights."[22] To decide such claims we use the two-pronged *Risher* test adapted from criminal cases:

> Before reversal will result, there must first be a finding that counsel's conduct either generally throughout the trial or in one or more specific instances did not conform to the standard of competence which we have enunciated.

---

[21] Alaska R. Evid. 703.

[22] *See V.F. v. State*, 666 P.2d 42, 44-45 (Alaska 1983).

Secondly, there must be a showing that the lack of competency contributed to the [termination].[23]

It is the parent's burden to prove both *Risher* prongs; the parent's failure to prove one of the two is sufficient reason to reject the claim.[24]

We "apply a strong presumption of competence" to an attorney's performance, including "the further presumption that trial counsel's actions were motivated by sound tactical considerations."[25]  "An 'attorney's reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken.' "[26]  And we view the disputed actions "in the framework of trial pressures."[27]

Penn argues that his attorney's failure to object to the disputed evidence was "inconsistent with [the conduct] of a lawyer of ordinary training and skill in defending child welfare cases."  He contends that the "exhibits depicted Penn as a dangerous sex offender who presented a risk to pre-pubescent children like Ruby, and the hearsay objection to those records was obvious," and he cites a series of cases

---

[23]     *Id.* at 46 (quoting *Risher v. State*, 523 P.2d 421, 425 (Alaska 1974)).

[24]     *See Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1265 (Alaska 2014) (placing the burden for both prongs on the litigant bringing the ineffective assistance of counsel claim).

[25]     *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 784 (Alaska 2012) (quoting *State v. Jones*, 759 P.2d 558, 569 (Alaska App.1988)).

[26]     *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 858-59 (Alaska 2013) (quoting *Alexander v. State*, 838 P.2d 269, 273 (Alaska App. 1992)).

[27]     *P.M. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 42 P.3d 1127, 1131 (Alaska 2002).

showing that parents' lawyers in termination proceedings "routinely object to the admission of hearsay." Penn argues that "there was no strategic advantage to be gained by allowing the state to characterize Penn as an antisocial sex offender who presented a danger to pre-pubescent minors and who had a history of sexually abusing multiple family members" and that the attorney's failure to object was "objectively unreasonable, satisfying the first prong of the ineffective assistance of counsel standard."

OCS and the GAL counter that there is a reasonable justification for a tactical decision not to object. An objection may have prompted OCS to call the declarants and the psychologists as witnesses and present live testimony on these sensitive issues, which could have been more problematic for Penn than the paper records.[28] Furthermore, hearsay is admissible at termination trials for most purposes — including findings regarding a parent's failure to remedy conduct, OCS's reasonable efforts, and the child's best interests — as long as it is "probative of a material fact, has circumstantial guarantees of trustworthiness," and the opposing party had a fair opportunity to respond.[29] And some of the statements Penn disputes from the psychological assessments were likely admissible as his own statements.[30] Given all this,

---

[28] *See, e.g.*, *Mute v. State*, No. A-10130, 2010 WL 1838594, at *4 (Alaska App. May 5, 2010) (quoting trial judge's finding that trial attorney might make "conscious decision not to object" to evidence in order to avoid opposing party's attempt to present it in admissible and "more convincing form").

[29] CINA Rule 18(f); *see, e.g.*, *S.C. v. State, Dep't of Fam. & Youth Servs.*, No S-7649, 1999 WL 33958766, at *1 (Alaska Feb. 10, 1999) (holding in CINA case that where "evidence was admissible on the issue of whether there had been and continued to be an imminent and substantial risk of harm to [the child,] . . . counsel cannot be faulted for failing to object to it").

[30] Alaska R. Evid. 801(d)(2) (regarding hearsay exclusion for statements offered against a party opponent); Alaska R. Evid. 803(4) (regarding hearsay exception (continued...)

a competent attorney could have decided against objecting and requiring the court to focus on this evidence in order to sift out the admissible from the inadmissible. In sum, we agree that a reasonable attorney may have made a tactical decision not to object, given the possible consequences, and Penn's conclusory statement that "there was no strategic advantage" is not sufficient to overcome the presumption of tactical decision-making.[31] Because Penn has not shown that his trial attorney's conduct "was below a level that any reasonably competent attorney would provide" and could not "have been a reasonable tactic,"[32] we reject his claim of ineffective assistance of counsel and do not need to reach the prejudice prong of the analysis.[33] We therefore affirm the termination order.

---

[30] (...continued)
for statements made for purpose of medical treatment).

[31] *See Steffensen v. State*, 837 P.2d 1123, 1126-27 (Alaska App. 1992) (rejecting argument that attorney acted incompetently by failing to file suppression motion over petitioner's argument that "there was everything to gain and nothing to lose by filing" such motion, and holding that petitioner had not overcome presumption of competence).

[32] *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1265-66 (Alaska 2014).

[33] *See id.* at 1265 ("It is not necessary to address the first prong of the test when the litigant has not satisfied the second prong."). We note the parties' different understandings of the applicable standard under the second *Risher* prong. Penn argues that he must only show "a reasonable doubt that the incompetence contributed to the outcome," citing *Risher v. State*, 523 P.2d 421, 425 (Alaska 1974). The GAL, on the other hand argues that Penn must show that improved performance "would have changed the outcome of trial," citing *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 786 (Alaska 2012) (holding that a father had failed to show that "an improved . . . performance would have made a difference in the outcome of his case"). OCS uses the same language as the GAL. We do not need to resolve this difference here because of our holding that Penn has not met the first *Risher* prong.

**C.** **We Decline To Adopt Penn's Proposed Framework For Our Consideration Of Allegations Of Ineffective Assistance Of Counsel In Parental Rights Termination Cases.**

Penn asks us to establish a new framework for our consideration of claims of ineffective assistance of counsel in parental rights termination cases. His proposal, modeled after criminal post-conviction relief actions initiated in the superior court, would "use the appellate process to essentially screen ineffective assistance claims."[34] Parents would bring such claims "contemporaneously with other appellate claims in an opening brief challenging a termination order," as Penn did here. According to Penn, "When [the] opening brief establishes a prima facie case of ineffective assistance of counsel — and only then — this court would remand the case to the trial court for litigation on that claim (assuming it does not reverse the termination order on other grounds)."

To establish a prima facie case under Penn's model, the parent would have to show both "an act or omission by the lawyer at trial that could be considered unreasonable" and causation — i.e., "that the unreasonable act or omission contributed to the decision to terminate [the parent's] parental rights."[35] The presumption of attorney competence and tactical decision-making would not apply at this stage of appellate review, thus "obviat[ing] the need for this court to speculate why a lawyer acted and whether that speculative tactical decision was reasonable." Our consideration of the claim would be limited to determining "whether the parent has pointed to 'facts which, if true, would entitle the applicant to the relief claimed' "; if so, we would remand the

---

[34]    *See* AS 12.72.010-.040 (outlining post-conviction relief procedures in criminal cases); Alaska R. Crim. P. 35.1 (same).

[35]    Penn limits his argument "to claims of ineffective assistance of counsel relating to the lawyer's actions or failure to act at trial," noting that "claims relating to a lawyer's representation outside of what occurred at trial would not appear in the record on appeal" and would have to be factually developed.

case to the superior court for evidentiary proceedings.  If, on the other hand, the parent failed to make out a prima facie case, we would "resolve the claim in the direct appeal, minimizing delay and the risks that follow."[36]

Applying this framework to his own case, Penn argues that he has set out a prima facie case for ineffective assistance.  He contends that his attorney's failure to object to the hearsay evidence was objectively unreasonable; that the record does not clearly show a tactical reason for the failure, and we cannot speculate that there was one; and that we should therefore remand his claim to the superior court for factual development.  We reject Penn's ineffective assistance claim for the reasons given above, but we again set out the ways in which we consider claims like his.

We have said that we resolve ineffective assistance claims "as presented to us."[37]  This has included deciding claims on direct appeal even though they were not raised in the trial court.[38]  We have also considered an appeal of a superior court's denial of an Alaska Civil Rule 60(b)(6) motion alleging ineffective assistance at trial.[39]  Our cases allow — and will continue to allow — parents the flexibility to decide whether to

---

[36]     Penn concedes that "[t]he record on direct appeal . . . will rarely be sufficient for this court to conclude that the lawyer's representation was *not* effective" (emphasis added).

[37]     *Chloe W.*, 336 P.3d at 1266.

[38]     *See, e.g.*, *V.F. v. State*, 666 P.2d 42, 45-47 (Alaska 1983); *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 858-59 (Alaska 2013) (deciding claim on direct appeal despite mother's request for remand to trial court for evidentiary hearing); *cf. Geisinger v. State*, 498 P.3d 92, 112 (Alaska App. 2021) (recognizing that direct appeal is appropriate only in those "rare instances where an attorney's incompetence is plain from the record of the underlying trial").

[39]     *David S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 270 P.3d 767, 784 (Alaska 2012).

bring a claim of ineffective assistance to us on direct appeal or to the superior court through a Rule 60(b)(6) motion.[40] We will continue to resolve these claims as they are presented to us, which means that we will apply the presumption of competence when considering the first *Risher* prong on direct appeal.

We acknowledge that in other circumstances we have refused to entertain ineffective assistance claims brought on direct appeal.[41] Penn criticizes our decision to reject such claims on the merits in CINA cases, noting that "[t]he record on direct appeal may be sufficient for this court to conclude that a lawyer's representation was effective, but it will rarely be sufficient for this court to conclude that the lawyer's representation was not effective." Quoting *V.F. v. State*, he argues that the record "will seldom

_____

[40] We have acknowledged the rare case in which we may conclude that an ineffective assistance claim raised on direct appeal is not proven but still requires further factual exploration on remand to the superior court. *See Chloe W.*, 336 P.3d at 1266 (noting our prior "implicit[] recogni[tion] that we would remand for an evidentiary hearing if it were appropriate"); *Risher v. State*, 523 P.2d 421, 425 n.20 (Alaska 1974) ("At times it may be necessary to remand for an evidentiary hearing on [the second prong]. For example, if [an appellant] contend[s] that trial counsel could have discovered helpful evidence, we might remand for a hearing on that issue.").

[41] *See Wetherhorn v. Alaska Psychiatric Inst.*, 156 P.3d 371, 383-84 (Alaska 2007) (holding in context of appeal of commitment and involuntary medication hearing that ineffective assistance claim "cannot be effectively reviewed for the first time on appeal" and therefore declining to address merits of patient's argument, instead instructing her to bring motion for relief under Civil Rule 60(b) or habeas corpus petition under Alaska Civil Rule 86), *overruled on other grounds by In re Hospitalization of Naomi B.*, 435 P.3d 918 (Alaska 2019)); *Barry v. State*, 675 P.2d 1292, 1295-96 (Alaska App. 1984) (holding that in the criminal context, absent plain error, ineffective assistance of counsel claims must first be brought to the trial judge as a motion for a new trial or an application for post-conviction relief). In *Wetherhorn* we expressed sentiments similar to Penn's here, writing: "In this case, we cannot review a claim for ineffective assistance of counsel without an explanation in the record for counsel's actions; otherwise we become engaged 'in the perilous process of second-guessing.' " 156 P.3d at 384 (quoting *Barry*, 675 P.2d at 1295).

establish 'the range of reasonable actions which might have been taken by an attorney skilled in the law,' "[42] or that the "attorney did not engage in the complained-of representation for a tactical reason." He argues that in rejecting past claims brought on direct appeal, we have had to resort to speculation about the tactical nature of a counsel's decision or the impact of an error on the trial's outcome.

Justice Bolger raised similar concerns in a concurrence in *Chloe W.*, in which he disagreed with our decision to review the mother's ineffective assistance claim.[43] He observed that because she had not raised the claim in the superior court, there was no order for us to review and the record contained no explanation of her attorney's decision.[44] Therefore, Justice Bolger concluded, "the record is simply inadequate to make out a case of ineffective assistance of counsel" and we should have "simply decline[d] direct review."[45] He suggested instead that a litigant should be required to "establish a record concerning counsel's challenged acts or omissions by applying to the trial court to seek a new . . . hearing."[46]

The court in *Chloe W.* responded by observing that it was the mother's choice to raise her ineffective assistance claim for the first time on appeal.[47] We wrote: "She has new counsel on appeal who had an opportunity to evaluate the ineffective

---

[42]    666 P.2d at 46.

[43]    *Chloe W.*, 336 P.3d at 1271-73 (Bolger, J., concurring).

[44]    *Id.* at 1271-72.

[45]    *Id.* at 1273.

[46]    *Id.* at 1272.

[47]    *Id.* at 1267 (majority opinion). Penn's case is arguably different from *Chloe W.* in that he has not asked us to decide the ultimate question of whether he received ineffective assistance; he has asked instead for a remand.

assistance of counsel claim and how it might best be presented. She raised the claim on direct appeal but failed to substantiate it based on the record before us."[48]

Although we understand Justice Bolger's stated concerns in *Chloe W.*, we reiterate — in agreement with a number of other states' courts[49] — that CINA cases merit an exception to our typical rule requiring that an issue must first be raised and decided in the trial court before it may be considered on appeal. Our position is driven largely by expediency; delayed resolution of CINA cases "adversely affects the parties' rights, extends uncertainty in the child's life . . . , and increases the possibility of the child suffering permanent harm."[50] And the "language and spirit" of Alaska's statutory CINA scheme instruct us to resolve these cases expeditiously.[51] We will therefore continue our practice in CINA cases of reviewing ineffective assistance claims as they are brought to us on the record we are given and applying our presumption of competence in that analysis.

## V.    CONCLUSION

We AFFIRM the order terminating Penn's parental rights.

---

[48]    *Id.*

[49]    *See id.* at 1266 (observing that direct appeal is the majority approach and "generally is faster and minimizes delay").

[50]    *Id.*

[51]    *See Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 858 (Alaska 2013) ("Our statutes make clear that children's proceedings are to be expeditiously resolved. . . . [For example,] AS 47.10.088(k) requires a trial court to rule on a termination petition within 90 days after the last day of the termination trial. AS 47.10.080(i) imposes a similar 90-day limit for an appeal to be decided.").