NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| KASH B. (Father), | ) |
| | ) Supreme Court No. S-19210 |
| Appellant, | ) |
| | ) Superior Court Nos. 3HO-22-00005/ |
| v. | ) 00006 CN (Consolidated) |
| | ) |
| STATE OF ALASKA, DEPARTMENT | ) MEMORANDUM OPINION |
| OF FAMILY AND COMMUNITY | ) AND JUDGMENT* |
| SERVICES, OFFICE OF CHILDREN'S | ) |
| SERVICES; KIM B. (Mother); | ) No. 2102 – August 22, 2025 |
| ASHTON B. (Minor); and SOFIE B. | ) |
| (Minor) | ) |
| | ) |
| Appellees. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Homer, Bride Seifert, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. David A. Wilkinson, Senior Assistant Attorney General, Anchorage and Treg Taylor, Attorney General, Juneau, for the Appellee State of Alaska. Jenna C. Klein, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for the Appellee Kim B. Amanda J. Harber, 49th State Law, LLC, Soldotna, for Appellee Ashton B. Alicia Porter, Law Office of Alicia Porter, Sitka, for Appellee Sofie B.

---

\* Entered under Alaska Appellate Rule 214.

Before:  Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

## I.   INTRODUCTION

The superior court terminated a father's parental rights to his two children. The father now appeals, arguing the superior court erred in finding that the Office of Children's Services (OCS) made reasonable efforts toward reunifying him with his children.  He also argues that his attorneys were ineffective for failing to request a visitation hearing.  Because the superior court did not err in its reasonable efforts determination and the father's attorneys were not ineffective, we affirm the termination of the father's parental rights.

## II.   FACTS AND PROCEEDINGS

### A.   Background Information

Kash B. is the father of Ashton B. and Sofie B.[1]  For several years before the incident triggering their removal, Kash, who lived with his wife Tracy B., had primary custody of the children.  Prior to this litigation, the children's mother, Kim B., had not seen the children in several years.[2]

In late June 2022, Tracy was driving with Kash and the children in the car. Tracy and Kash began to argue and Kash poured beer on Tracy, grabbed the steering wheel and veered toward a tree, and punched Tracy repeatedly while she was driving. When they got home, he continued to strike her until she lost consciousness.  Ashton ran barefoot to his neighbor's home to seek help and Kash chased after him while yelling.  Kash fell and Ashton was able to get to the neighbor's house.  The neighbor called 911; both he and Ashton spoke to dispatch.  While Kash was chasing Ashton, Sofie ran inside the family home and hid from Kash.

---

[1]   Pseudonyms have been used to protect the parties' identities.

[2]   Kim does not challenge the termination of her parental rights.

Kash was arrested for domestic violence assault, criminal mischief, and violating conditions of release imposed in a prior case of driving under the influence (DUI). Throughout this matter, Kash had criminal cases pending based on the underlying incident of domestic violence and his prior DUI. As a result of those criminal cases, Kash was ordered not to have any contact with Tracy, not to return to the residence, and not to consume or possess alcohol. The children remained with Tracy, but the next day Tracy bailed Kash out of jail and drove him back to the house. OCS, accompanied by Alaska State Troopers, came to the home to follow up on the previous evening's assault. When OCS discovered that Tracy had brought Kash back to the residence, the children were removed and placed with their grandmother, Rachel. Ashton and Sofie have remained with Rachel since.

Although removal was precipitated by concerns related to domestic violence, OCS came to have additional concerns about the children's home life. For instance, OCS received reports that when the children got in trouble, they were made to sleep on the floor in an uninsulated area of the home with no blankets, or Kash would make emotionally charged statements to the children that withheld parental love or asserted a child was no longer welcome in the home or as a member of the family.

Rachel enrolled both children in therapy. Ashton was diagnosed with post-traumatic stress disorder (PTSD). Sofie was diagnosed with an adjustment disorder with mixed mood, anxiety, and depression, referred to by the therapist as "PTSD light." Both Rachel and the children's therapist observed that the children gradually improved as they settled into living with Rachel.

### B. Proceedings

OCS created an out-of-home safety plan, citing "[s]ignificant concerns related to domestic violence in the presence of the children." The plan initially limited the children's contact with Kash and Tracy to supervised telephonic communication. The children were placed with Rachel to "ensure they remain[ed] safe and all their everyday needs [were] met." Roughly a week after the incident, OCS filed a petition

for adjudication of children in need of aid and for temporary custody. In support of its petition, OCS reasoned that the children "had two unsafe parents, and [Kim] had another [Child in Need of Aid (CINA)] case so . . . she wouldn't be a . . . potential placement for the children." Kash conceded that both Ashton and Sofie were children in need of aid.

OCS executed a case plan for Kash with the primary goal of reunification with Ashton and Sofie. The plan included three goals: (1) to achieve and maintain sobriety, (2) to keep the children safe and stop being abusive, and (3) to learn healthy anger coping mechanisms. To aid in achieving these goals, Kash was required to participate in a batterer's intervention program, complete an integrated mental health assessment and follow subsequent treatment recommendations, and attend alcohol treatment programming. The plan indicated it should be updated every six months or as otherwise appropriate.

OCS was responsible for coordinating visitation between Kash and the children. At the beginning of the case, neither child wanted contact with Kash, although they initially had supervised weekly visits with Tracy.[3] OCS explained that even without visitation, Kash could write his children letters. Ashton never had visits with Kash and was adamantly opposed to having in-person contact with him for the entire course of the proceedings. Initially, Sofie did not have any visits with Kash because she "was fearful of him" but eventually she was open to visitation.

OCS facilitated two series of visitation between Sofie and Kash: the first on Zoom and the second in-person. The Zoom visits ended when Sofie said she did not want to see her father anymore. Eventually, Sofie told the OCS caseworker that she

---

[3] Rachel described Sofie as "spiraled off" after one of her visits with Tracy, observing that Sofie started having nightmares, punched Ashton, and had troublesome behavior at school. Rachel also noted that this triggered Ashton, causing both children to "go back into old cycles." We decline to consider OCS's visitation efforts with Tracy as informative of its efforts with respect to Kash.

wanted to try to see her father again, this time in person. Once in-person visits began, the children's therapist observed that Sofie stopped progressing and it was like she "regressed all the way back to the very beginning, like [they] hadn't done any work at all." Sofie "exhibited regression and all sorts of behavior changes," including bathroom accidents at school and being rough with other kids. Ashton had increased "dissociation, nightmares, flashbacks, and avoidant behavior" from seeing his sister regress. After witnessing this regression, the therapist wrote a letter citing these behavioral details, urging a pause to visitation. She noted that she had only made a similar recommendation in one other case, and was recommending that here because "it was alarming how large the response was." In April 2023, OCS suspended visitation.

During this time period, Kash's attorney, expressed concerns about the lack of visitation between Kash and his children, and requested the court order mediation of the parties' disagreement about the need for visitation. Mediation failed, and at a status hearing, Kash's attorney stated her belief that the parties were not going to resolve the visitation issues informally. She said that she was not requesting a visitation hearing yet but that she would follow up with Kash. A request for a visitation hearing was never filed.

OCS conducted two formal case plan evaluations with Kash over the course of proceedings: the first was a few months after the therapeutic suspension of visitation, and the second shortly before trial. At the first evaluation, the caseworker noted that Kash had made significant progress toward the goal of sobriety but had made only some progress toward understanding the importance of his children's safety and well-being and the necessity of healthy coping strategies. The evaluation noted that Kash had begun a domestic violence intervention course, but he had missed multiple sessions and was reported to not be integrating the information. The evaluation also noted that Kash had not completed an integrated mental health assessment.

In the fall of 2023, Kash was appointed a new attorney, who represented him for a few months and mainly with respect to scheduling matters.

OCS filed a petition to terminate Kash's parental rights in December 2023. OCS argued that Kash had failed to demonstrate accountability for how his "behaviors ha[d] negatively impacted the children and caused significant trauma." OCS took the position that Kash continued to minimize the children's trauma responses and to deflect blame. OCS argued that "a parent can't change what they don't acknowledge and it [was] understood through provider records that [Kash] continue[d] to distance himself from his own behaviors and [was] not making an honest effort to change." For those reasons, OCS argued that it was in the best interests of the children that Kash's parental rights be terminated.

Kash wrote only one letter to each child: both letters were sent within a few weeks of the petition for termination and over a year after the children were removed from his care.

After the termination petition was filed, Kash was appointed a new attorney, his third in the case, who represented him for the rest of the superior court proceedings.[4] She decided that a reasonable path forward would be to address visitation in the future termination trial. Her rationale was that Kash would still be able to present issues "related to contact with his children" that would "go to [OCS] efforts" related to disposition and permanency.

OCS then held its final case plan evaluation and noted that Kash completed his goal of being a sober caregiver but had only made some progress toward understanding the importance of his children's safety and well-being. Kash had completed a batterer's intervention program but had missed multiple sessions. Kash attended a few therapy sessions in August 2023, but the provider noted that he did not

---

[4] Throughout the case, Kash was represented by three attorneys.

meaningfully engage in his sessions and that he commented that he only wanted a couple of sessions to prove to the court that he attended counseling. He arranged for more steady counseling with a therapist beginning in October 2023, though the provider records indicated that he continued to be resistant to services. By the final case plan evaluation, OCS found he had made significant progress toward learning the necessity of healthy coping strategies because he had been engaged in regular individual counseling since January 2024. However, OCS again noted concerns about Kash's minimization of the children's responses to their trauma when the agency continued the out-of-home placement.

The court held a six-day trial in April 2024, which concluded with the termination of Kash's parental rights. Kash conceded that the children were subjected to conditions such that they were children in need of aid. The court noted that Kash was "not seek[ing] immediate reunification," but rather an extension of time "to have visitation with the children, engage in family therapy, and allow the children to see the changes that he ha[d] made." However, the court concluded that Kash "failed, within a reasonable time, to remedy the conduct or conditions in the home that place the children in substantial risk so that returning the children to the parent would place the children at substantial risk of physical or mental injury." The court explained that though Kash completed a batterer's intervention program, substance abuse counseling, and started mental health counseling, he continued to lack insight into the trauma his children had experienced.

The court next found by clear and convincing evidence that OCS "made timely, reasonable efforts in this case to provide family support services to the children and to the parents designed to enable the safe return of the children to the family home." The court listed the efforts made by OCS: "case planning; [interstate placement] study for possible placement with [Kash]'s mother; referral to Batter[er]'s Intervention; referrals to substance abuse treatment; referral to mental health assessment and mental health counseling; recommendation to write letters to children; video and in-person

visits for [Sofie]; counseling for both children." However, the court also acknowledged flaws in OCS's efforts: Kash's case plan was not updated every six months, Kash was not given guidance on how to write letters, and OCS did not pursue re-engaging visitation with the children once there was a therapeutic recommendation to cease.

The court found by a preponderance of the evidence that it was in the children's best interests to involuntarily terminate Kash's parental rights and responsibilities. Kash appeals, raising two issues: (1) whether OCS made reasonable efforts toward reunification; and (2) whether his counsel was ineffective for failing to move for a visitation hearing. OCS, Sofie, Ashton, and Kim all filed responses.

## III. STANDARD OF REVIEW

Our review of "[w]hether OCS made reasonable efforts to reunify [a] family is a mixed question of law and fact."[5] Factual findings are reviewed for clear error,[6] and "are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[7] Whether the requirements of the applicable CINA statute are satisfied by factual findings is a question of law.[8] Whether a parent's due process right to effective assistance of counsel was violated is also a question of law.[9] Questions of law are reviewed de novo.[10]

---

[5]     *Annette H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 450 P.3d 259, 265 (Alaska 2019) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012)).

[6]     *Id.*

[7]     *Claudio P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 860, 863 (Alaska 2013) (quoting *Sherman B.*, 290 P.3d at 427-28).

[8]     *Annette H.*, 450 P.3d at 265.

[9]     *Penn P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 522 P.3d 659, 664 (Alaska 2023).

[10]     *Id.*

# IV. DISCUSSION

## A. OCS Made Reasonable Efforts Toward Reunification.

Alaska Statute 47.10.086(a) describes OCS's duties to make reasonable efforts to provide family support services to reunite parents and children who are in out-of-home placements. OCS must:

> (1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;
>
> (2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; [OCS] shall refer the parent or guardian to, and distribute to the parent or guardian information on, community-based family support services whenever community-based services are available and desired by the parent or guardian; the information may include the use of a power of attorney under AS 13.26.066 to select an individual to care for the child temporarily; and
>
> (3) document [OCS]'s actions that are taken under (1) and (2) of this subsection.[11]

"We have acknowledged that [OCS] has some discretion both in determining what efforts to pursue and when to pursue them."[12] The scope of efforts OCS must provide is related to a parent's willingness to participate in offered services.[13] That is, "[a] parent's demonstrated unwillingness to participate in treatment may be considered in determining the reasonableness of state efforts."[14] It is well established that OCS's efforts "must be reasonable but need not be perfect."[15]

---

[11]  AS 47.10.086(a).

[12]  *Sherman B.*, 290 P.3d at 432.

[13]  *Id.*

[14]  *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[15]  *Sherman B.*, 290 P.3d at 432.

Kash argues that OCS did not make reasonable efforts toward reunifying him with Ashton and Sofie. His arguments fall into two categories: those related to OCS's case-planning efforts and those related to OCS's visitation efforts.

**1. OCS's case-planning efforts were reasonable.**

Kash contends that because OCS created only one case plan, and the case plan was not changed or updated despite his progress, OCS did not make reasonable efforts toward reunification. OCS argues that it provided recommendations on how to progress but that Kash resisted its recommendation for individual counseling, rejected suggestions from the children's therapist, and made minimal, and late, efforts to write the children. OCS argued that where Kash did not complete the initial plan goals, it need not have added additional goals to the plan.

When reviewing OCS's case-planning efforts, the superior court found that Kash "did follow . . . the state plan," completing the batterer's intervention program, engaging in counseling, and getting sober; however, it expressed concerns about the fact that he "didn't fully engage with [the batterer's intervention program]" and did not begin therapy until nearly "15 months after it was recommended." The court found at the time of the termination, Kash had not "sufficiently addressed his anger and control issues," explaining that he "needed to be . . . controlling the anger long before 2024 in terms of the timelines for these cases and the needs of the children." The court took issue particularly with the fact that, at the time of trial, Kash was still blaming others and "ramping up his anger." It commented that his effort was "too little, too late," recognizing that he had made "tremendous strides" but did not engage soon enough in mental health services to help him recognize and control his anger.

We have recognized reasonable efforts even when there is "a brief lapse in OCS's provision of services" and that OCS maintains discretion in deciding what

efforts to pursue at what time.[16] In *Casey K.*, the parent challenging OCS's efforts "consistently failed to follow her case plan."[17] In challenging OCS's efforts, she identified the agency's failure to timely provide requisite collateral information for her substance abuse evaluation.[18] Though Kash takes issue with OCS's failure to update the case plan, "[a] parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide."[19] Much like the parent in *Casey K.*, Kash was "definitely opposed" to individual counseling for the majority of the time OCS was involved in reunification efforts. Though he takes issue with the fact that the case plan was not reevaluated every six months, Kash's resistance to participating in OCS-recommended therapy was a roadblock to progress in understanding his anger and coping mechanisms, one of the goals in his case plan. Thus, it was reasonable that OCS did not update or change Kash's goals on his case plan in its entirety, even if he made strides in other aspects of his case plan.

### 2. OCS's visitation efforts were reasonable.

Kash also takes issue with the limited visitation with Sofie, and lack of visitation with Ashton, following their removal from his care. He argues that OCS must still work with parents "even if the outlook is bleak and the likelihood of success is low."[20] He argues that "no obvious roadblock to visitation existed" and that lack of visitation hindered the ability to move toward reunification. OCS disagrees, noting that

---

[16] *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 646 (Alaska 2013).

[17] *Id.* at 647.

[18] *Id.* at 646.

[19] *Sean B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 251 P.3d 330, 338 (Alaska 2011).

[20] *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child's Servs.*, 407 P.3d 442, 448 (Alaska 2017).

its visitation efforts are controlled by whether visitation is in the children's best interests.[21]

The CINA statute provides that "[i]f a child is removed from the parental home, [OCS] shall provide reasonable visitation between the child and the child's parents, guardian, and family."[22] OCS generally may only deny visitation to a parent if "there is clear and convincing evidence that visits are not in the child's best interests."[23] In *Doug Y. v. State, Department of Health & Social Services, Office of Children's Services*, we upheld the superior court's reasonable efforts determination where OCS stopped visitation between a child and his abusive father.[24] In that case, when the child had visitation with his father, the child experienced "increased agitation and anxiety following the visits."[25] The child had been diagnosed with PTSD and we concluded that being triggered by visits with his father "justified the decision to stop . . . visitation."[26] Here, Ashton and Sofie had mental health diagnoses similar to the child in *Doug Y.* On the prospect of returning home to his father, Ashton articulated severe emotional responses and threats of self-harm, and remained vehemently opposed to seeing his father. His sister's visitation led to regression in her therapeutic progress, with follow-on impacts to Ashton, who responded negatively to his sister's behavior. Although Kash argues that he was complying with his case plan, his compliance does

---

[21] AS 47.10.086(f) (noting "primary consideration" for reasonable efforts is "child's best interests").

[22] AS 47.10.080(p).

[23] *Id.*

[24] 243 P.3d 217, 229 (Alaska 2010).

[25] *Id.*

[26] *Id.*

not mean visits were in his children's best interests.  The court did not err in finding cessation of visitation was appropriate in this case.[27]

The remaining question is whether OCS should have attempted to resume visitation after it was suspended.  The suspension was recommended by the children's therapist in April 2023 and the termination trial did not start until nearly a year later in April 2024.  The statute provides that:

> If [OCS] denies visitation to a parent or family member of a child, [OCS] shall inform the parent or family member of a reason for the denial and of the parent's or adult family member's right to request a review hearing as an interested person.  A parent, adult family member, or guardian who is denied visitation may request a review hearing.[28]

The issue of visitation, and the emotional and psychological condition of the children, was repeatedly discussed among the parties throughout this case.  Kash was well aware of his children's conditions.  The children's therapist had a meeting with Kash to talk about why visits had stopped.  The therapist described at length the behavioral and emotional conditions of the children, including that they experienced nightmares. Further, Ashton consistently remained opposed to any visitation[29] and Sofie stopped asking about visitation with her father after it was suspended.  In these circumstances, it was reasonable to find that continued suspension of visitation remained in the children's best interests.

Although visitation was not ongoing, there were still options for Kash to communicate with his children.  The OCS caseworker had explained to Kash that he could write letters to Ashton and Sofie.  Kash only wrote two letters, one to each child, over the course of 18 months.  The letter to Sofie was never given to her, as it was

---

[27]     *See id.*

[28]     AS 47.10.080(p).

[29]     Ashton indicated that he was ready and willing to participate in mediation to oppose any further contact with his father.

determined to be inappropriate. The letter to Ashton included a gaming handle so Ashton could contact his father within an unsupervised gaming format; this would have been an inappropriate means of contacting the child, but OCS still delivered the letter. OCS also worked with the children to attempt to support a relationship with their father by continually addressing visitation in meetings with the children and considering options for family visits.

Kash argues that OCS did not make reasonable efforts because there were lapses in OCS's efforts with regard to case-planning and visitation. After reviewing the record, we conclude the superior court did not err. OCS considered and adapted to the children's trauma responses, and provided Kash resources to help him accomplish the goals of his case plan. For these reasons, we affirm the superior court's determination that there was clear and convincing evidence that OCS engaged in reasonable efforts toward reunification with Kash after his children were removed.

**B.      Kash Did Not Prove That His Attorneys Were Ineffective.**

Kash asserts that all three of his lawyers throughout the case provided ineffective assistance of counsel because the issue of lack of visitation was not litigated. OCS contends that Kash "cannot overcome the 'strong presumption' that his attorneys were motivated by sound, tactical decisions."

In CINA cases, a parent "has a constitutional right to the effective assistance of counsel in a proceeding to terminate parental rights."[30] We apply a two-prong test, first articulated in *Risher v. State*, for whether counsel was effective, and the parent has the burden of proving both of these.[31] First, there must be a finding that

---

[30]     *Penn P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 522 P.3d 659, 666 (Alaska 2023).

[31]     *Id.*; *see Risher v. State*, 523 P.2d 421, 425 (Alaska 1974) ("Before reversal will result, there must first be a finding that counsel's conduct either generally throughout the trial or in one or more specific instances did not conform to the standard

counsel's conduct did not conform to standards of competence.[32]  An attorney fails to meet standards of competence if the "attorney's performance was below a level that any reasonably competent attorney would provide, bearing in mind that 'reasonable tactical decisions are virtually immune from subsequent challenge even if, in hindsight, better approaches could have been taken.' "[33]  Second, "there must be a showing that the lack of competency contributed" to the termination of parental rights.[34]  Here, there were multiple tactical reasons to not litigate the issue of visitation, so we need not reach the second prong of the *Risher* test.

Kash presents several arguments about why his attorneys failed to provide effective assistance throughout the course of proceedings.  He complains that his first attorney was "clearly aware" of the lack of visitation and repeatedly raised the possibility of the need for a hearing, and concludes that her failure to seek a hearing was "simply nonsensical."  Kash takes issue with the fact that his second attorney "did not request a visitation hearing after taking over . . . and did not address visitation at all during her almost six-month tenure on the case."  He complains that his third attorney, who entered the case after the petition for termination and then through trial four months later, did not ask to bifurcate visitation from termination.

OCS and the other parties offer convincing explanations for why Kash's attorneys failed to request a visitation hearing, thus meeting minimum standards of

---

of competence which we have enunciated.  Secondly, there must be a showing that the lack of competency contributed to the conviction.  If the first burden has been met, all that is required additionally is to create a reasonable doubt that the incompetence contributed to the outcome.").

[32]    *Risher*, 523 P.2d at 425.

[33]    *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1265 (Alaska 2014) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 309 P.3d 850, 858-59 (Alaska 2013)).

[34]    *Penn P.*, 522 P.3d at 666 (quoting *Risher*, 523 P.2d at 425).

competence. Kash failed throughout to fully comply with his case plan and there had been a therapeutic recommendation that visitation cease. An attorney could have strategically chosen to delay a visitation hearing so as to avoid developing an evidentiary record that would disadvantage their client at another stage in the litigation. Especially given the children's responses to attempts at visitation, forming an evidentiary record could have been prejudicial to Kash at later stages in the proceedings. In fact, when the superior court issued its order terminating custody, it reasoned that though it initially had concerns over the lack of visitation, "after hearing the evidence, the court understands and supports the decision not to allow visitation." An attorney could have recognized this risk and made the decision to delay a visitation hearing to give a client more time to build a record favorable to allowing visitation.

Additionally, Kash had pending criminal cases connected to the incident triggering the removal of his children. Kash's attorneys had advised him against speaking openly in the batterer's intervention program for this reason. The underlying criminal matters involved Kash's use of alcohol and violent conduct, including the incident that led to removal of the children. These matters did not resolve until shortly before the termination trial. It was highly likely these issues would be relevant in a visitation hearing. If Kash were to invoke his right to remain silent in the visitation hearing, the superior court could have drawn adverse inferences about issues of abuse.[35] A reasonable and competent attorney would have a valid tactical reason to not place a client in that position. Informal resolution of the visitation issue through mediation, or delaying a formal hearing on visitation until after the criminal matters resolved, could both prove better options under the circumstances.

---

[35] *See Brad S. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 563 P.3d 610, 618-20 (Alaska 2025) ("[A]dverse inferences may be drawn from a parent's refusal to testify in a CINA case.").

Given the multiple tactical reasons for not requesting a formal visitation hearing over the course of the case, Kash's lawyers did not fail to display minimum competence, and we conclude that Kash's claim of ineffective assistance of counsel fails under the first prong of *Risher*.[36]

## V.    CONCLUSION

We AFFIRM the superior court's order terminating Kash's parental rights to Ashton and Sofie.

---

[36]    *Risher*, 523 P.2d at 425 ("Before reversal will result, there must first be a finding that counsel's conduct either generally throughout the trial or in one or more specific instances did not conform to the standard of competence which we have enunciated.").